**In re BLUE COAL CORPORATION, Debtor.**

**Bankruptcy No. 76–1311.**

United States Bankruptcy Court, M.D. Pennsylvania.

March 25, 1986.

See also, Bkrtcy., 47 B.R. 758.

Eric Brossman, McNees, Wallace & Nurick, Harrisburg, Pa., for Robert W. Cleveland, et al.

A. Richard Caputo, Shea, Shea & Caputo, Wilkes-Barre, Pa., for Anthracite Health & Welfare Fund.

158

Joseph R. Solfanelli, Solfanelli & Butler, Scranton, Pa., for McClellan Realty Corporation.

Robert C. Nowalis, John H. Doran, Doran & Nowalis, Wilkes-Barre, Pa., for James J. Haggery, Esq., Trustee for Debtor.

John J. Aponick, Jr., Griffith, Aponick & Musto, Wilkes-Barre, Pa., and Leon S. Forman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for North American Mining Co.

## MEMORANDUM AND ORDER

THOMAS C. GIBBONS, Bankruptcy Judge:

In this lengthy liquidation, begun as an involuntary proceeding in the late part of 1976 and followed by a consent to adjudication in February 1977, we have for disposition an "Application by the Trustee to Withdraw his Earlier Application to Enter into a Lease with Loree Associates and Alternatively Enter into a Lease Arrangement with North American Mining, Inc." It is obvious that a chronological account of the activities leading up to this application would be particularly helpful.

On February 22, 1985, the trustee filed an application "For Authority to Enter into Coal Refuse Lease with North American Mining, Inc." After due notice to all creditors and interested parties, a hearing was held on said application on August 8, 1985. On April 8, 1985, objections to the Trustee's application were filed by McClellan Realty Corporation and the Anthracite Health & Welfare Fund. Both objectors are substantial creditors. McClellan's claim arises out of an assignment of certain notes and mortgages executed on November 26, 1973 by the debtor, Blue Coal Corporation, Raymond Colliery Co., Inc., Olympic Associates, Inc. and Glen Nan, Inc. The Anthracite Health & Welfare Fund claim is allegedly provable in the amount of $2,420,000. Following a discussion of the objections by counsel it was decided to defer action on the application for the lease with North American Mining and attempt to resolve some of the objections raised by the two creditors. *Inter alia,* the objections raised concerned the insufficiency of information about the nature, quantity and quality of the material involved in the application to form a judgment as to whether the proposed lease was in the best interests of the estate. Additionally, the objections alleged the wrongful conversion of refuse material by North American Mining and its financial instability. (In his Brief in support of his present application the Trustee points out that the original application to lease to North American Mining came as a result of his belief that the "material in question was of marginal value inasmuch as the recovered coal from the refuse material was low and that the material had a unique value to North American Mining since the company had a processing plant in place on land adjoining the proposed lease area).

In January 1986, the Trustee sought new bids for the coal refuse material. The availability of this material for lease was advertised extensively in newspapers of general circulation in the anthracite region and by a direct mailing to a list of several hundred past or present producers in the anthracite industry.

The only response to the advertisements described above was a bid by Loree Associates in the amount of $2.02 per raw ton of material with a minimum monthly royalty of $20,000 per month. In the opinion of the Trustee the proposal was "unusual inasmuch as experts the Trustee consulted indicated that a fair royalty for material of this quality was approximately $1.00 per ton." Nevertheless "to maximize this estate's recovery from these assets", the Trustee filed his application for authority to enter a lease agreement with Loree Associates. Notice of the hearing to confirm the Trustee's authority to enter the said lease was sent by the Bankruptcy Clerk's Office and concluded with the following language:

"A hearing on the Trustee's Application will be held on Tuesday, February 18, 1986 at 2:00 o'clock P.M. at Courtroom No. 1, Federal Building, 197 South

Main Street, Wilkes-Barre, Pennsylvania. Unless objections are filed or higher bids received at that time an appropriate Order will be entered." (Underscoring supplied).

At the hearing on February 18, 1986 at 2:00 p.m. on the Trustee's application North American Mining, Inc. presented an alternative to the proposed Loree Lease to the Trustee and this Court. Apprised in advance of this possibility, Pagnotti Enterprises, Inc. filed an objection to the Trustee's entering a lease with North American Mining, Inc. Said objections were predicated upon a charge of improper conduct by North American in removing refuse material of the debtor without prior authority of the Bankruptcy Court. Trustee's counsel indicated that this matter which had been in dispute had been resolved on terms of the Trustee whereby North American Mining would pay the sum of $90,000 at the rate of $1.00 per ton for the amount determined by the Trustee to have been taken.

At the hearing of February 18, 1986, counsel for various interests, including the so-called Cleveland Group (another substantial creditor whose claim like that of McClellan Realty has been subordinated by a decree of the U.S. District Court for the Middle District of Pennsylvania in a related matter to the claims of all other creditors of this estate as fraudulent conveyances) and the Anthracite Health & Welfare Fund also participated. Pagnotti Enterprises argued vigorously for a continuance which would give it more time to study the proposal of North American Mining, but failed to convince the Court that it was so entitled. Counsel for the Trustee testified in some detail about the North American Mining proposal and pointed out that it increased minimum monthly royalties to $30,-000; that the proposal waived any right of recoupment; and extended the terms of the lease to exhaustion of the material or five (5) years with certain options arising thereafter. Complete discussion of the comparative provisions of the two proposed leases followed and subsequently, Loree Associates was given adjournments on two occasions to further consider the North American Mining proposal and to determine whether or not to submit a higher bid. Loree's counsel at the conclusion of these recesses indicated that it had elected not to submit any further bid and that it would rely on its right to appeal any order issued by the Court authorizing a lease with anyone other than Loree. The hearing of February 18, 1986 was adjourned with Trustee's counsel advising the Court that he would recommend approval of North American Mining's proposal and that he would request permission to withdraw the application previously submitted upon the Loree bid. Trustee's counsel also testified that he had discussed with Loree's counsel in advance of the February 18, 1986 hearing the longstanding custom of this Court dealing with private sales whereby competitive bidding has always been allowed at confirmation hearings.

On March 13, 1986, the Trustee filed an "Application to Withdraw Request for Approval of Lease with Loree Associates and to Approve Lease with North American Mining." The said application made it clear that in the judgment of the Trustee the North American Mining proposal was more beneficial to the estate and should be accepted. Prior to this application on February 26, 1986, objections were filed by the so-called Cleveland Group to the Trustee's entering a lease agreement with North American Mining, Inc. Essentially, the objections maintained that the North American Mining bid was a departure from the procedure outlined in the public solicitation of bids and that the Trustee had failed to establish that North American Mining was a responsible bidder. On March 3, 1986, the Anthracite Health & Welfare Fund filed objections which were similar to those filed by the Cleveland Group.

On March 10, 1986, Loree Associates and McClellan filed a joint "Application to Reopen Bidding." Said application pointed out that the Trustee was considering a bid of North American Mining which did not comply with the instructions to bidders in the public advertisement. It raised the question of financial responsibility again on

the grounds that North American Mining had improperly removed refuse material without knowledge or authority of the Bankruptcy Court. Additionally, it alleged that it had forwarded at the request of the Trustee "a new bid addressed to the framework of a five (5) year lease with a guaranteed monthly royalty of $30,000." This evidently has been rejected by the Trustee for a variety of reasons stated in the Trustee's Brief.

## DISCUSSION

We are governed in this matter by the provisions of the Bankruptcy Act of 1898, as amended, and specifically, § 70(f) of the statute, 11 U.S.C.A. § 110(f). In relevant part this section provides as follows:

"Real and personal property shall, when practicable, be sold subject to the approval of the court...."

It is well established that in a sale in bankruptcy, the Court is the real seller and the Trustee is its agent to obtain a higher possible price.

Volume 4B of *Colliers on Bankruptcy*, 14th edition deals with § 70 and analyzes the power to sell beginning at ¶ 79.97 at page 1128. On page 1129 the writer indicates that it has erroneously been said that the power to sell is the Trustee's as an inherent power, with a mere "supervisory" function left to the Bankruptcy Court. That section illustrates the character of the Trustee in bankruptcy as a mere instrumentality and that of the Bankruptcy Court as the true repository of the power to sell. The authors show that this is particularly evident in view of Rule 605(a) requiring the Trustee to collect the property of the estate and with the approval of the Court convert it to money. The provisions of Rule 606, Rule 203(a)(2) providing for notice to creditors of all proposed sales, serve to establish rules as to how the power of the Bankruptcy Court should be exercised or invoked. These provisions, of course, permit a broad margin of discretion and initiative in the trustee as an officer of the court. Hence, the bankruptcy courts have consistently respected the importance of the trustee's managerial functions and have abstained from any interference that would not seem indispensable for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders. But the powers reserved to the courts to direct the time and manner of a sale and to confirm it or to order a resale are of such nature that they can scarcely be termed "supervisory only". "The bankruptcy court is in fact the vendor...." (citations omitted).

Later in the analysis of the power to sell at page 1142 of *Colliers,* we find the following:

"A sale through proceedings in bankruptcy is a judicial sale, as distinguished from an execution sale. But the bankruptcy court has always been held to be exempt from certain formalities as to place, time and publicity of the sale, otherwise mandatory in federal judicial sales, and this exemption is now sanctioned by the federal statute itself. Moreover, the federal bankruptcy court's jurisdiction to liquidate the estate is exclusive, and cannot be restricted, curtailed or licensed by state or municipal laws." (citations omitted).

Although objections have been filed by the various parties, as indicated earlier, Loree Associates is the only one to submit a "Brief in Support of the Trustee's Application to Enter into Mining Lease with Loree Associates Without the Allowance of Additional Bids." Basically, it argues that the bid of North American offered at the hearing on February 18, 1986 should not be considered by the Court or the Trustee since it was received after the January 31, 1986 deadline contained in the Trustee's advertisement. In support thereof it cites several cases. The first is *In re Gil-Bern Industries, Inc.,* 526 F.2d 627 (1st Cir. 1975). There the Court of Appeals for the First Circuit addressed the issue of time limitations contained in a notice of judicial sale. The notice of judicial sale had stated that all offers had to be made before 11:00 a.m. on May 29th, and that objections would be heard at 2:00 p.m. on May 29th.

One bid was received by the specified deadline. At the confirmation hearing, the bankruptcy judge permitted another party to submit a bid of $451,000.00. Thereafter, the timely bidder under protest made a new offer of $452,888.00, and sale at that amount was confirmed by the bankruptcy judge. Upon the appeal of the successful bidder to be allowed to purchase at his original bid, the Court of Appeals held that where there is no local custom to the contrary, it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer was received after the bidding was closed. Several other cases were cited where post-deadline bids were in fact rejected by the courts.

Responding to the argument, North American argues that Loree has overlooked the fact that in most of these cases the notice of sale came from the court and not the trustee. Citing *Colliers*, 14th ed., ¶ 70.98 at p. 1154–55, North American points out that:

> "Sales in bankruptcy are effected under the authority and direction of the bankruptcy court. These directions are ordinarily incorporated in the order issued in response to the petition to sell after notice, if any, to creditors. *Collier on Bankruptcy*, ¶ 70.98[3] at 1154–55 (14th ed.).
>
> Moreover, the powers reserved to the Courts to direct the time and manner of a sale and to confirm it or to order a resale are of such a nature that they can scarcely be deemed to be 'supervisory' only. The bankruptcy court is in fact the vendor. *Id.* at ¶ 70.97[1] at 1130. *Accord, Matter of A.H.–R.S. Coal Corp.*, 8 B.R. 455, 458 (Bankr.W.D.Pa.1981) ('[T]he Court is the real vendor ... Consequently, only upon confirmation by this Court does the sale confer property rights upon the purchaser.')"

The *Gil-Bern* case, *supra*, relied on by Loree, is readily distinguishable from the situation at hand. In fact, it is clearly inapposite and must be seriously considered to support the contrary position which Loree asserts. First, as indicated above, in the present situation the notice of which Loree complains was not sent by the Bankruptcy Court, but consisted of an advertisement published by the Trustee for the solicitation of bids. While given widespread circulation it resulted in one proposal only, that of Loree Associates. On page 629 of *Gil-Bern*, *supra*, we find the following:

> "If there is no local custom to the contrary, we are in accord with the established rule that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed. (citing cases)."

The notice set forth hereinafter reflects the longstanding custom in this Court for at least 30 years, well known to all counsel, permitting the submission of higher offers at the time of hearing of the application to confirm any proposed sale. A recent example of this is the sale of property owned by the debtor on Route 115 across from the Wyoming Valley Mall. Objections to the proposed sale were filed by McClellan Realty and the Anthracite Health & Welfare Fund as creditors in this liquidation. Notice to creditors indicated that the proposed sale price was $450,000 to Frank & Wallace, Inc. of Kingston, Pennsylvania and contained, *inter alia*, the following paragraph:

> "Hearing on objections, if any, and acceptance of higher offers will be held on February 14, 1984 at 10:00 a.m. in Courtroom # 1, Federal Building, 197 South Main Street, Wilkes-Barre, Pennsylvania. Valid written objections must be filed on or before February 8, 1984."

At the hearing on February 14, 1984, two additional bidders appeared and the property was finally sold to Toys R Us (through its counsel) for the sum of $555,000. This is consistent with the custom and practice of all private sales in this Court for the past 30 years. The unquestioned clarity of

the notice and the familiarity of counsel for the objectors with the longstanding custom makes it impossible to consider that any irregularity occurred here or that the result is unfair to anyone.

There can be no doubt that the notice of the hearing of the Trustee's Application to enter the lease with Loree set forth a different deadline for the receipt of bids to that contained in the Trustee's solicitation of bids in his newspaper advertisement. As set forth earlier, that notice concluded with the following language:

"A hearing on the Trustee's Application will be held on Tuesday, February 18, 1986 at 2:00 o'clock P.M. at Courtroom No. 1, Federal Building, 197 South Main Street, Wilkes-Barre, Pennsylvania. Unless objections are filed or higher bids received at that time an appropriate Order will be entered."

Loree's argument seems to suggest that the Trustee was locked into the time frame established in the newspaper advertisement and that he could not under any circumstances deviate from its contents. This is simply not the case. Nothing could have prevented the Trustee from waiving any of the restraining restrictions set forth in the advertisement if the best interests of the estate would be served by his action. Obviously, if his deviation in any way constituted unfairness to any interested party it could not be allowed. For a variety of reasons there can be no claim of unfairness. First, like all interested parties, Loree had notice that higher bids would be received on February 18, 1986. Secondly, as the Trustee testified, its counsel had considered the possibility of competitive bidding with Loree's counsel prior to February 18, 1986. Since Loree's counsel and Pagnotti Enterprises' counsel are one and the same, and written objections were prepared to present at the hearing on February 18, 1986, it would be hard to establish any unfairness as a result of receiving North American's proposal.

North American's Brief also contains the following quotation from In re Susquehan-na Chemical Corporation, 92 F.Supp. 917 (W.D.Pa.1950):

"The Trustee in bankruptcy, in securing bids, is a salesman on behalf of the court, and it is understood by the bidder and the Trustee, as well as third parties, that anybody is free to bid upon the day of sale in spite of any bids previously accepted by the Trustee. Generally, the highest bid upon the day of sale receives the approval of the court. Previous bidders, whose bids have been accepted by the Trustee, are free to be ignored.

Until such approval upon the day of sale, this Court does not detect the existence of a binding contract. The purchaser, therefore, cannot be bound until acceptance and approval by the Court."

This decision is consistent with the cases cited in Colliers in the prior discussion of § 70 earlier in this opinion.

Finally, it is a well established principle of Bankruptcy law that the objective of bankruptcy sale and leases, and the trustee's duty with respect to such sales or leases, is to obtain the highest price or greatest overall benefit possible for the estate. The foregoing can hardly be challenged in any respect.

By a supplemental submission North American cites the case of In re Stanley Engineering Corporation, 164 F.2d 316, (C.A.A.3rd, 1947). It has long been regarded as the leading case in this Circuit. At page 318 the following appears:

"That judicial sales, made upon due notice and in accordance with law, will be confirmed unless (a) there was fraud, unfairness or mistake in the conduct of the sale; or (b) the price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake. Mere inadequacy of price is not a sufficient ground for setting aside a judicial sale where there was no unfairness in the conduct of the sale. In determining whether gross inadequacy exists the bankruptcy court must take into consideration appraisement of the property as a guide in the exercise of its discretion

in accordance with the intendment of the statute cited. Where the bankruptcy court fails to confirm a judicial sale in the absence of unfairness, fraud, or mistake or gross inadequacy of price, its action will be reversed on the ground of abuse of its legal discretion.

We subscribed to the principles enumerated in *Jacobsohn v. Larkey*, 3 Cir., 1917, 245 F. 538, p. 541, L.R.A. 1918C, 1176. In doing so we stated as follows:

Judicial sales are an indispensable part of the machinery employed in administering bankrupt estates. Public policy requires stability in such sales. *The Ruby*, D.C. 38 F. 622; *In re Burr* (Mfg. & Supply Co., 2 Cir.) 217 F. 16, 19, 133 C.C.A. 126. To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final. *Pewabic Mining Co v. Mason*, 145 U.S. 349, 356, 12 S.Ct. 887, [888] 36 L.Ed. 732; they are not to be disturbed except for substantial reasons.

After much experience in scrutinizing bidding at judicial sales, courts now uniformly hold that the mere offer to pay more than the price bid is not a substantial ground for setting aside a sale, recognizing nothing will more certainly tend to discourage and prevent bidding than a judicial determination that the highest bidder may be deprived of the advantage of his accepted bid by an offer of another person, subsequently made, to bid higher on resale. *Morrisse v. Inglis*, 46 N.J.Eq. 306, 19 A. 16; *In re Metallic Specialty Mfg. Co.*, D.C., 193 F. 300; *In re Shapiro*, D.C. 154 F. 673."

It must be said that there is not the slightest suggestion of fraud, unfairness, or mistake in the conduct of the sale in question. Loree Associates knew in advance of the likelihood of an alternative proposal by North American Mining and had every opportunity to exceed it, but elected not to do so. (It was the only other party in interest to be considered). Instead, together with other submissions, it has filed an Application to Reopen the Bidding. In the opinion of the Trustee, it is at very least ambiguous and, therefore, unacceptable to him. It would be manifestly unfair to allow the bids to be reopened at this juncture after Loree Associates expressly declined the offer to submit a higher offer at the appropriate time. The Application must, therefore, be denied.

In the course of this proceeding, the Court precluded any testimony on the issue of the financial stability of North American Mining. Two factors prompted this action. First, the announcement by the Trustee's counsel that the controversy over the allegedly improper conduct of North American Mining had been amicably resolved on the Trustee's terms and secondly, the assurance by North American's counsel that its proposal would be accompanied by either a satisfactory performance bond or a Bank Letter of Credit. Together these facts operate to overcome the objections about North American Mining's improper conduct and eliminate any apprehension about its financial stability.

In the judgment of the Court this decision is consistent with the earlier statement from *Colliers* to the effect that the Bankruptcy Courts have consistently respected the importance of the Trustee's managerial functions and have abstained from any interference that would not seem indispensable for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders. This policy reflects the broad margin of discretion and initiative in the Trustee as an officer of the Court. In the present situation it is especially appropriate. Faced with a prodigious task in the administration of the largest estate that this District has ever confronted, the Trustee has acquitted himself in an exemplary fashion. His performance reflects his business acumen, and mirrors the high esteem with which he is held as a member of the Bar and as an outstanding member of the community.

In view of the foregoing we, therefore, enter the following Order.