**In re Charalabos BAKALIS, a/k/a Bob Bakalis, Debtor.**

**Bankruptcy No. 194–12310–353.**

United States Bankruptcy Court, E.D. New York.

Feb. 26, 1998.

---

Phillips Nizer Benjamin Krim & Ballon L.L.P. by Louis A. Scarcella, James P. Seery, Jr., Leslie S. Barr, Garden City, NY, for Trustee.

Moses & Singer L.L.P. by Alan Kolod, Mark N. Parry, New York City, for Atlantic Bank of New York.

Winthrop, Stimson, Putnam & Roberts by Glen E. Siegel, New York City, for Olympian Holdings, L.L.C.

Department of Justice, Office of U.S. Trustee by Alfred M. Dimino, Garden City, NY.

McCarter & English by Edward S. Nathan, Newark, NJ, for First Savings Bancorp of Little Falls.

### DECISION ON TRUSTEE'S RECOMMENDATION RE: SALE OF STOCK

JEROME FELLER, Bankruptcy Judge.

Before the Court is a controversy arising from a Chapter 7 auction sale, conducted pursuant to § 363(b) of the Bankruptcy Code. The auction punctuates over two years of effort by the trustee to market and sell certain property of the estate. That property, shares of common stock, comprises a controlling interest in Olympian Bank, a small community bank operating in Brooklyn and Queens. The trustee recommends approval of a sale to Olympian Holdings, LLC ("Holdings"), which he believes offered the highest and best price. Atlantic Bank of New York ("Atlantic"), a rival bidder, objects to the proposed sale to Holdings and advances various grounds for denying approval, including protestations that bad faith taints the sale. Atlantic also contends that its bid is superior and urges approval of its offer to acquire the stock. For the reasons set forth below, the Court approves the sale to Holdings for $10.5 million, notwithstanding Atlantic's offer of $11.2 million. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, made applicable to this contested matter by Rule 9014.

### I. BACKGROUND

Charalabos Bakalis ("Debtor"), upon filing a voluntary petition under Chapter 11 of the Bankruptcy Code on March 24, 1994, owned 308,344 shares of common stock, representing approximately a 75–80% controlling interest in Olympian Bank.[1] The Debtor's reorganization effort aborted and on August 17, 1995, the Chapter 11 case was converted to Chapter 7 and Gregory Messer was appointed trustee ("Trustee"). The shares thus became property of the Chapter 7 estate primed for liquidation. Although a sale of the stock could have occurred soon after conversion, the Trustee proceeded cautiously in order to obtain full value from a sale of the estate's most valuable singular asset. For advice and assistance in selling the shares the Trustee turned to his counsel, Phillips Nizer Benjamin Krim & Ballon LLP, and

---

1. The exact percentage of ownership is in question because the Trustee claims that an additional 18,328 shares, currently registered in a trust for the benefit of Konstantina Bakalis, the Debtor's daughter, is property of the estate. Each bidder agreed to purchase this additional stock on the same terms provided in their respective offers, if the Trustee eventually prevails. Regardless, a determination of the rightful owner of these additional shares is not central to the instant dispute and awaits another day for resolution.

retained Carl Marks Consulting Group Company as financial adviser.

In consultation with his advisers, the Trustee determined that the stock could not command the highest price possible until two outstanding issues "clouding" the stock's value and "restricting" the stock's sale were resolved. The first of those impediments was existing litigation instituted by PNC Bank of Kentucky ("PNC Bank") against Olympian Bank, claiming damages in the aggregate amount of approximately $15 million. *See PNC Bank, Kentucky, Inc. v. Olympian Bank,* 899 F.Supp. 1399 (W.D.Pa.1994). Entities interested in acquiring the stock either discounted their offer or conditioned their offer upon final disposition of this lawsuit. Although Olympian Bank was exposed to substantial damages in that suit, the board of directors opted not to accept PNC Bank's settlement proposal, after deciding that the overture was too costly. Believing that a compromise was ultimately in the best interest of creditors, the Trustee achieved a resolution of the lawsuit whereby the estate would contribute monies in a negotiated settlement. Court approval of a settlement was obtained, after notice and a hearing, by order dated July 8, 1997.

The second issue related to change in control arrangements and an employee severance pay plan that the board of directors of Olympian Bank adopted subsequent to the conversion of the Debtor's case to Chapter 7 ("Board's Post–Conversion Resolutions"). Faced with the inevitable sale of the controlling stock, the board adopted this program presumably to encourage management and employee loyalty and performance in the face of an uncertain future, by way of recompense in the event of an unfriendly takeover of Olympian Bank. The estimated cost of the Board's Post–Conversion Resolutions totaled $2.3 million. The Trustee believed these sums were excessive and instituted formal proceedings to set aside the Board's Post–Conversion Resolutions. Eventually, the Trustee negotiated a settlement of this matter resulting in an approximately 50% reduction of the total potential payments. Exposure was reduced to $1.2 million, of which $400,000.00 was earmarked for members of Olympian Bank's board of directors. This settlement also received Court approval, after notice and a hearing, by order dated July 8, 1997.

Prior to resolution of the PNC Bank action and the dispute over the Board's Post–Conversion Resolutions, the Trustee had already begun an aggressive marketing campaign, "shopping" the stock to several entities that had expressed an interest. The Trustee rebuffed a strong effort by one entity to compel a sale for only $3 million. Atlantic, a business competitor of Olympian Bank, was one of the several entities expressing an interest in purchasing the shares. After rejection of lesser offers by the Trustee, Atlantic and the Trustee agreed on a purchase price of $8.5 million, which was embodied in a letter of intent dated May 2, 1997. The transaction was to be structured as a sale/merger, subject to downward price adjustments if the Trustee's efforts in either the PNC Bank or Board's Post–Conversion Resolutions litigations proved unsuccessful. Arduous discussions ensued over the terms of a proposed contract of sale. Negotiations progressed slowly in the face of ongoing disagreement over who would shoulder the burden of certain risks leading up to closing. Atlantic demanded various protective contingency clauses and walk away provisions. These provisions raised the spectre that a closing of the transaction with Atlantic might never occur or that there might be delays, perhaps substantial, in concluding the sale. Accordingly, the Trustee pushed for the exclusion or modification of Atlantic's contingency clauses and walk away provisions. Talks continued, but there was no resolution to the impasse.

While Atlantic and the Trustee attempted to reach an agreement, a newly organized entity, Holdings, entered the competition for the purchase of the stock. Composed of about 50 investors, including four Olympian Bank officers and directors, Holdings was organized for the specific purpose of purchasing the controlling shares of stock. In early July of 1997, Holdings offered $9.25 million for a relatively straightforward sale of the stock, conditioned only on the securing of regulatory approval. Negotiations progressed rapidly, with the Trustee entering into an

agreement, on July 22, 1997, to sell the stock to Holdings for $9.25 million, subject to higher and better offers ("Stock Purchase Agreement"). Armed with the Stock Purchase Agreement, the Trustee sought and obtained an order, dated August 8, 1997, scheduling a public auction, setting forth bidding and sale procedures, and providing appropriate notice requisites.

In addition to Holdings, three other entities submitted written bids for the shares: Atlantic, First Savings Bancorp of Little Falls ("Little Falls"), and Realty Capital Holdings, LLC ("RCH"). One week prior to the scheduled auction, by letter to the Court dated September 24, 1997, the Trustee outlined each offer. Atlantic offered $9.585 million in the context of a sale/merger transaction. Little Falls bid $9.45 million for a stock purchase that would in large measure track the form of the Stock Purchase Agreement, reserving the right to request additional terms. Like Little Falls, RCH bid $9.45 million, also structured as a stock purchase that would adopt the form of the Stock Purchase Agreement. Atlantic and Little Falls responded to one of the Trustee's concerns, that regulatory approval or other prerequisites for closing could lead to costly delay. They amended their bids to provide a 6% per annum interest enhancement to the purchase price, added at closing ("Extension Fee"). RCH also provided a similar provision in its bid, and while Holdings was not required to amend its $9.25 million offer prior to the scheduled auction, it adopted the Extension Fee.

The Trustee analyzed each bid in his September 24, 1997 letter—taking into account factors such as the total purchase price, closing risks, and the anticipated time required to complete the transaction—and reached a preliminary assessment designating the bid submitted by Little Falls as "highest and best", if it would meet certain conditions. Namely, Little Falls had to accept the terms of the Stock Purchase Agreement with only minor modification, and obtain a firm financing commitment. Atlantic's bid offered the highest purchase price, but was not designated as the preferred bid because its offer still contained contingencies to closing that the Trustee found unacceptable. RCH's bid went largely unanalyzed because the Trustee was provided with little or no background information about RCH. This rendered evaluation of RCH's financial strength difficult and an overall assessment of its offer a virtual impossibility. The Trustee observed that as more information became available, the strengths and weaknesses of RCH's bid could be properly assessed.

## II. THE FINAL OFFERS

The auction sale, comprised of four rounds of bidding that spanned almost four hours, allowed the contestants to raise the monetary consideration and improve the non-monetary elements of their bids.[2] No new bidders came forward. RCH withdrew from consideration altogether. Little Falls did not formally withdraw and continued its efforts to compete by enhancing its offer with various non-monetary amendments, but did not increase its $9.45 million bid. In contrast, Atlantic and Holdings increased their monetary bids substantially, made changes to various non-monetary provisions, and emerged as the primary competitors for the right to purchase the shares of stock.

The final Holdings bid offers $10.5 million in base consideration, structured as a simple purchase of the stock. The specific terms of the sale are governed by the Stock Purchase Agreement, with regulatory approval remaining as the only material contingency to closing. Holdings modified its Extension Fee to provide payment of 25% of the purchase price per annum interest, with accrual starting 60 days after court approval of the sale. Interest would continue to accrue until closing, and would then be added to the purchase price. If closing fails for any reason whatsoever, the accrued interest is "at risk" and would be paid to the estate as reimbursement for delay in the stock's ultimate disposi-

---

**2.** Originally set for September 30, 1997, the auction was rescheduled for October 15, two weeks later. The postponement was an unfortunate product of a near fatal heart attack suffered by counsel for one of the bidders during negotiations conducted in the courtroom shortly before the originally scheduled auction.

tion and any possible diminution in value occurring during that period.

Atlantic's final bid is structured as a sale/merger for $11.2 million in base consideration. Its offer includes an Extension Fee that would be paid to the estate at closing, and would accrue at the rate of 6% of the purchase price per annum, beginning 60 days after court approval of the sale. Atlantic modified its Extension Fee to provide that either 60 days after court approval of the sale or upon approval of the merger by Olympian Bank's board of directors and shareholders, whichever occurs later, interest would accrue at the rate of 20% per annum for the ensuing 150 days, reverting to 6% thereafter. Atlantic's offer provides at risk monies in the event of a failure to close as follows: $100,000.00 if regulatory approval is denied, and $250,000.00 if regulatory approval is not obtained and the Trustee exercises his right to terminate the sale because of that failure. Another facet of the Atlantic offer is an indemnity fund, in the amount of $500,000.00, to cover litigation expenses incurred by the estate in efforts to secure a merger ("Indemnity Fund"). If monies in the Indemnity Fund remain unused, one fourth of any balance amount would be added to the purchase price. Atlantic's proposal contains various closing contingencies, including: (1) absence of pending (or threatened in writing) litigation or proceedings that could have a material adverse effect on the business or financial condition of Olympian Bank ("Pending Litigation Clause"); (2) securing of all consents, approvals or waivers of third parties that are required in connection with consummating the sale and merger, unless the absence of such consent, approval or waiver would have no material adverse effect on the merger or Atlantic as the surviving entity ("Material Consents Clause"); and, (3) absence of action by Olympian Bank's board of directors outside of the ordinary course of business or inconsistent with reasonable business practices which would reasonably be expected to result in an adverse effect on the business, financial conditions or prospects of Olympian Bank ("Material Adverse Change Clause"). Furthermore, the offer contains certain walk away clauses, including provisions that allow Atlantic to terminate the transaction if: (1) Olympian Bank's board of directors fail to approve the merger within 90 days of entry of an order approving the sale, and (2) if shareholder approval of the merger is not obtained within 150 days of an order approving the sale.

## III. THE TRUSTEE'S RECOMMENDATION

After the close of bidding on October 15, 1997, the Trustee and his advisers caucused to examine the final bids, and returned to recommend that the Holdings bid of $10.5 million be approved. The competing bid of $11.2 million was alluring, but nonetheless unable to win the contest for Atlantic. The Trustee characterized his decision as a close call, with the Holdings bid chosen based on an analysis of certain aspects of Atlantic's offer. Foremost among these were the various contingencies or "outs" that would allow Atlantic to avoid closing the transaction; for example, the Material Adverse Change Clause, a provision that the Trustee believed endows Atlantic with a potential pretext for withdrawal from the proposed sale. Another example is the provision allowing Atlantic to terminate the transaction if Olympian Bank board of director approval of the merger is not obtained within 90 days after court approval of the sale. The Trustee believed this time frame was much too tight. Considerably more time would be necessary in the event of resistance by the existing board of directors to the merger.

The Trustee weighed the chance that business disruption might result from a sale to Atlantic, concluding that a possible loss of key management may well be deleterious to the profitable operations of Olympian Bank. That departure may lead to a diminution in value of Olympian Bank should depositors with connections to those managers choose to leave as well. Finally, the Trustee evaluated the $700,000.00 dollar spread between the two bids in light of the differences in their respective Extension Fees, and determined that the Holdings provision, which provides roughly $218,000.00 per month, substantially narrowed this gap.

After objections to the Trustee's recommendation were lodged by Atlantic, evidentiary hearings were conducted on December 5 and 7, 1997, at which time Atlantic was afforded the opportunity to cross-examine the Trustee and his advisers, and also present witnesses of its own. At the hearing, the Trustee testified that his decision was reached after a careful review of both the base consideration offered and an estimate of the certainty and expedition with which the transaction could be finalized. In an attempt to avoid risk, the Holdings bid was recommended, as it was conditioned only on regulatory approval. Atlantic's final bid, in contrast, continued to include various contingencies and outs that would allow it to avoid closing. The Trustee stated that throughout the months leading up to the auction, he attempted to negotiate away or mollify those terms in an effort to insulate the estate from risk, but Atlantic continued to insist on their inclusion.

Olympian Bank has been experiencing growth and profitable operations in recent years under the stewardship of its current board of directors and management. Olympian Bank and Atlantic are business competitors anchored in the same ethnic community. Atlantic's objective in the pursuit of the controlling interest of Olympian Bank is an open secret and the Trustee realizes that Atlantic's planned merger might result in a protracted battle with Olympian Bank's board of directors. Such a battle could eventually require removal of the current board of directors. The Trustee testified that, in light of the fact that Olympian Bank is a small neighborhood institution that relies on personal relationships fostered between its managers and customers, a departure of key people may result in loss of deposits and a corresponding diminution in value of the stock. Furthermore, replacing the board of directors would per force lead to additional delays in consummating a merger transaction. A meeting of shareholders may have to be convened and a new board of directors elected. The new board of directors would require time to obtain professional advisers and complete their due diligence. Moreover, litigation might ensue at any stage of the merger approval process.

According to the Trustee, the chance that Olympian Bank could experience a downturn in value—from a loss of deposits, diminished performance of a new board of directors, or sheer delay in closing—combined with Atlantic's contingency clauses and walk away provisions, constitutes a substantial gamble for the estate. The Trustee expressed fear that if Atlantic failed to consummate the merger for any reason, the estate would be left with an asset of lesser value to remarket and sell. In the final analysis, the Trustee recommended the Holdings bid because of its relative simplicity and near certainty of closing the transaction with some degree of alacrity. Choosing the nominally higher Atlantic bid, which provides only 6% more in base consideration, was unwise from the Trustee's perspective.

## IV. DISCUSSION

Section 363(b)(1) of the Bankruptcy Code governs the present dispute and provides that "[t]he trustee, after notice and a hearing, may ... sell ..., other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (1995). Unlike judicial sales under the former Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV–TV, Inc.,* 143 B.R. 315, 319 (D.P.R.1991), *vacated on other grounds,* 165 B.R. 1 (D.P.R.1992), *aff'd in part, rev'd in part,* 983 F.2d 336 (1st Cir.1993); *accord In re Canyon Partnership,* 55 B.R. 520, 524 (Bankr.S.D.Cal.1985). In fact, in most situations, sales that are properly noticed and set for hearing do not even require formal judicial approval. *See In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 & n. 8 (Bankr.N.D.Ill.1994).

If there are objections, however, the trustee must seek approval of the proposed sale from the bankruptcy court. The appropriate standard used by courts in reviewing a trustee's recommendation has been enunciated in myriad ways. *See, e.g., In re Schipper,* 933 F.2d 513, 515 (7th Cir.1991) (stating that

sales are an exercise of a fiduciary duty that requires an "articulated business justification"); *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir.1985) (opining that the sale must result in the estate obtaining the best price possible under the circumstances); *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D.Mo.1988) (holding that a sale must be both "fair and reasonable" in price and made in "good faith"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr.D.Del.1987) (holding that the transaction must be "fair and equitable" and in "good faith"); *In re Charlesbank Laundry Co.*, 37 B.R. 20, 22 (Bankr.D.Mass.1983) (stating that the sale must be "in the best interests of the estate and creditors"). These variations all fall under the rubric of the "business judgment" test. *See* 3 Collier on Bankruptcy § 363.02[1][g], at 363–14 (Lawrence P. King, ed., 15th ed. rev.1997).

■ Although a trustee's business judgment enjoys "great judicial deference," *WPRV–TV*, 143 B.R. at 319, this discretion is not without limit. A duty is imposed upon the trustee to maximize the value obtained from a sale, particularly in liquidation cases. *See, e.g., In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr.N.D.Ill.1995) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr.N.D.Ohio 1992) ("[T]he trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors."); *DiMarco v. Flannery (In re Flannery)*, 11 B.R. 974, 977 (Bankr. E.D.Pa.1981) ("In a liquidation case, the sale to the highest bidder is legally essential. . . ."); *see also* 11 U.S.C. § 704(1) (among other responsibilities, the Trustee has the duty to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as compatible with the best interests of parties in interest"). A trustee must also seek to avoid undue risk, particularly when dealing with money of the estate. *See* 11 U.S.C. § 345 (providing strict rules for the investment of money of the estate); *see also* 11A Scott on Trusts § 174, at 468 (4th ed.1987) (stating that a trustee, who has a duty to preserve the estate, must use "caution that may be greater than that of a prudent man who is dealing with his own property").

■ To ensure compliance with those duties, a bankruptcy court is generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales. *See In re WPRV–TV, Inc.*, 983 F.2d 336, 340 (1st Cir.1993); *Chung King*, 753 F.2d at 549 (citing *In re General Insecticide Co.*, 403 F.2d 629, 630–631 (2d Cir.1968)). Furthermore, in appropriate circumstances it is proper for a court to interfere with the trustee's judgment "for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders." *In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr.M.D.Pa.1986); *see also G–K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*, 994 F.2d 744, 745 (10th Cir.1993) (approving the sale to an alternate bidder that was not recommended by the trustee).

■ This Court finds no cogent reason to disagree or interfere with the Trustee's judgment. The Trustee concluded that the Holdings bid was the most advantageous to the estate, basing his decision on a totality of relevant considerations, including the dollar amount offered. The Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid. Not only has the Trustee used reasonable business judgment in selecting the Holdings bid, he convincingly articulated the reasons for recommending the bid of Holdings and supported his reasoning at the subsequent evidentiary hearings. A bankruptcy trustee is a conservator of the estate and must, to the extent possible, be risk averse. The Trustee declined the temptation of jeopardizing virtually assured benefits by supporting a bid that exposes the estate to a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset. Accordingly, the Court ratifies the Trustee's recommendation and approves the sale to Holdings.

### A. Atlantic's Objections

Atlantic sprays shotgun-like objections at the Trustee's recommendation to sell the stock to Holdings and maintains that it

should be awarded the right to purchase the Olympian Bank stock. In broad terms, Atlantic questions the reasoning underlying the determinations and assessments made by the Trustee and even postulates that the bidding process itself was inherently unfair. Atlantic also impugns the good faith purchaser status of Holdings. Although Atlantic's onslaught does not fail for lack of ammunition, its shots miss the target.

### 1. The Holdings Bid Is Not Highest and Best

Atlantic insists that its bid is plainly the highest and best because it exceeds Holdings' bid by $700,000.00.[3] Indeed, a trustee's duty to maximize the return to a bankruptcy estate often does require recommendation of the highest monetary bid, *see In re Gil–Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir.1975), thus the highest bidder at an auction sale can typically expect to be declared the winner. *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn, Inc.)*, 107 F.3d 558, 566–67 (8th Cir.1997); *In re Wintex, Inc.*, 158 B.R. 540, 545 (D.Mass.1992). On the other hand, overemphasis of this usual outcome overlooks a fundamental truism, i.e., a "highest" bid is not always the "highest and best" bid. The inclusion of "best" in that conjunction is not mere surplusage. As indicated above, the two bids in this case differ by more than just price. The evidence showed that the $10.5 million offered by Holding was on deposit in a separate account available for payment upon closing and that relatively quick regulatory approval of the Holdings offer seemed likely. The Holdings bid was recommended by the Trustee, in the main, because of the perceived certainty and estimated rapidity with which the transaction would likely close. Basically, the relative lack of risk placed upon the estate by the Holdings bid in comparison to the Atlantic bid outweighed, in the

Trustee's judgment, the latter's higher dollar amount.

Not surprisingly, other courts have made similar observations when comparing bids that do not have identical terms. For example, in *Broadmoor Place Investments*, 994 F.2d at 745, a bidder had offered $5.7 million, subject to financing and other contingencies, for the purchase of a debtor's office building. The bankruptcy court, however, awarded the sale to a purchaser that offered only $5.5 million in cash, but whose offer contained no material contingencies. Even though the approved bid was $200,000.00 lower, the court found that "it provided fewer contingencies and facilitated a more immediate closing." *Id.; see also In re After Six, Inc.*, 154 B.R. 876, 883–84 (Bankr.E.D.Pa.1993) (commenting that the court's refusal to approve a lower bid was a close call, even though that bid was nearly $2 million lower than the higher offer of $7.1 million). Similarly, in *In re Landscape Properties, Inc.*, 100 B.R. 445 (Bankr.E.D.Ark.1988), the court stated that

[i]n deciding whether to approve a purchase offer or in choosing which is the better offer when competing offers have been made, courts generally consider factors in addition to a higher dollar amount. It has been held, however, that in a liquidation case it is "legally essential" to approve the highest offer, *although this assumes that the offers and offerors are in all other respects comparable.*

*Id.* at 447 (emphasis added) (quoting *Flannery*, 11 B.R. at 977). The court later added that while the recommended purchaser was "obviously not making the highest offer on the property, it may be the better offer." *Id.* at 448.

In a similar vein, Atlantic attacks the Trustee's determination that Holdings' Extension Fee is superior and claims that the provision does nothing to narrow the mone-

---

**3.** Given Atlantic's contention that its bid is so clearly superior to the Holdings offer, one would expect support for such position by a creditor or other interested party. To the contrary, only the United States Trustee voiced an opinion—affirmatively supporting the recommendation to sell the shares to Holdings. No creditor has stepped forward and objected to the Trustee's recommendation. This includes the estate's largest claim

holder, Republic Bank, which has monitored the sale proceedings on an ongoing basis. Such keen interest is not surprising, considering Republic has instituted litigation that seeks imposition of a constructive trust on the stock, thereby establishing entitlement to the sale proceeds. *See* Complaint, *Crossland Federal Savings Bank v. Charalabos Bakalis*, AP No. 195–1751 (Bankr. E.D.N.Y. Dec. 8, 1995).

tary gap between the two bids. Atlantic labels the 25% interest accruals as "illusory" or "bells and whistles". According to Atlantic, Holdings should face little, if any, problem in securing regulatory approval, and Atlantic's regulatory expert testified that obtaining regulatory approval rarely takes longer than 60 days. Therefore, Holdings' Extension Fee, which does not begin to accrue interest until 60 days after judicial approval of the bid, will not add any monetary value to the ultimate sale price.

Atlantic's agitation respecting Holdings' Extension Fee is misguided at best. Merely asserting that the estate will likely never collect any monies under the Holdings Extension Fee ignores a core purpose of that provision. It should not be viewed solely as a possible enhancement to the purchase price; the interest that accrues, at the substantial rate of $218,000.00 per month, has been placed at risk if closing fails for any reason. The Extension Fee, in effect, operates as a quasi-liquidated damages clause. It pays accrued interest whether or not the transaction closes and thus ensures that the estate will be compensated for any delay or failure to close, whether caused by a difficulty in obtaining regulatory approval or due to some other unforeseeable problem.

In contrast to the Holdings provision, Atlantic's Extension Fee is payable only if the sale/merger is consummated. And unlike the Holdings offer, Atlantic's offer does not protect or compensate the estate for a failure to close under all circumstances. Instead, its offer includes a provision that places $100,-000.00 at risk should regulatory approval be denied, and sets aside $250,000.00 if regulatory approval is not obtained and the Trustee exercises his right to terminate the sale because of such failure. While this provides the estate some measure of protection, Atlantic offers protection from only one risk— failure to secure regulatory approval. Furthermore, although Atlantic's regulatory expert did testify that approval rarely takes longer than 60 days, he also stated that approval could conceivably require as long as 150 days to obtain. This hardly justifies Atlantic's certainty that the estate will not receive any tangible benefit from Holdings'

Extension Fee. Indeed, were regulatory approval of Holdings' acquisition of the shares to take 150 days, interest accruals under Holdings' Extension Fee would aggregate approximately $654,000.00, reducing to a *de minimis* amount the $700,000.00 spread between the bids of Holdings and Atlantic. Moreover, if Atlantic truly believes its contention that the benefits of Holdings' Extension Fee are illusory, we are unable to fathom Atlantic's reticence to match, or even exceed, the terms provided by Holdings. The reality is that Atlantic has opted to assign risks to the estate by narrowly tailoring safeguards to regulatory approval matters, and limiting payment of its Extension Fee only in the event of a successful closing.

#### 2. *The Bidding Process Was Unfair*

■ Atlantic contends that since the Holdings bid was recommended primarily on the strength of its structural and non-monetary components, the public auction was unfair because the value of those components were unknown. Atlantic could not effectively bid in that it could not determine the value ascribed to those components, despite requests that the Trustee quantify the non-dollar differences between the two bids. Therefore, since the amount required to win the contest against Holdings was unknown, Atlantic complains that it suffered the distinct disadvantage of being unable to ascertain when its bid could possibly warrant the designation of "highest and best" by the Trustee. In essence, Atlantic laments that if a $700,000.00 difference in the bids is not enough to be deemed highest and best, how much is enough?

Contrary to Atlantic's cries of unfairness, there is no requirement that competing purchasers be given precise valuations of the non-dollar components of their bids. For example, in *Consumer News & Business Channel Partnership v. Financial News Network Inc. (In re Financial News Network Inc.)*, 134 B.R. 737 (S.D.N.Y.1991), *aff'd* 980 F.2d 165 (2d Cir.1992), bidders were faced with the task of assessing the relative value of structurally different offers, which also had varying non-monetary provisions, that made comparison of the bids difficult.

*See id.* at 741. Although one bidder had repeatedly asked for a valuation of the non-dollar components of a rival bidder's offer, the court answered that the prospective purchaser would "have to bid according to its own estimate of the [rival's] bid." *Id.* at 738.

Even assuming that Atlantic was placed in the posture of bidding somewhat in the blind, there is no proof or even indication that Holdings possessed any greater knowledge of the value the Trustee may have assigned to the structural and non-monetary aspects of the bids. Atlantic and Holdings are sophisticated entities able to utilize their considerable business acumen in assaying the risks and benefits of their bids, as well as the limit of monetary consideration each was willing to ultimately bring to the table. Yet, despite negotiations focused upon relieving the Trustee's concerns regarding risk, which had been ongoing since as early as May of 1997, Atlantic was determined to retain its contingency clauses and walk away provisions. The truth is that neither Atlantic nor Holdings had definitive information regarding values allocated to the structural and non-monetary factors, although over the course of negotiations both were acutely aware that the Trustee favored less risk. In a nutshell, Holdings merely made a better estimate of assessing the value of these intangible factors.

### 3. The Trustee's Perception of Risk Is Unfounded

As shown above, Atlantic's offer contains many conditions to consummation of its transaction, including approval of a merger agreement by the board of directors of Olympian Bank and time constraints for obtaining such approval. The Trustee, in his judgment, sees in these conditions risks that a closing with Atlantic may never transpire or, at the very least, may be delayed for a substantial period of time. Atlantic claims the Trustee's fears are unfounded or exaggerated.

Atlantic asserts that mergers are the typical vehicle employed in bank acquisitions and that its Material Adverse Change Clause, Pending Litigation Clause, Material Consents Clause and time deadlines are mundane, "vanilla" terms included in transactions of this sort. Further, Atlantic strives mightily to convince this Court that swift approval of a merger agreement will be forthcoming. This notion is predicated upon a number of premises. First, Olympian Bank's board of directors will not likely oppose the merger as it is against their pecuniary interests to do so. Atlantic argues that, under the settlement agreement resolving the dispute over the Board's Post–Conversion Resolutions, opposition to the merger constitutes cause for removal with a resultant loss of remuneration. Second, even if the board of directors were to oppose the merger, the Trustee, as controlling shareholder, could elect a new board of directors at the annual meeting of shareholders or remove the board at a special meeting of shareholders called for that purpose. And, in the event of litigation, Atlantic maintains that the Indemnity Fund of $500,000.00 would provide adequate protection to the estate. Finally, Atlantic contends that the Trustee's anxieties regarding business disruption and loss of deposits upon a merger are baseless, as such phenomena are rare in bank mergers.

Efforts to derogate the Trustee's perception of risk are without merit.[4] Atlantic overlooks the environment within which its bid was submitted and fails to accord recognition that its offer is anything but a typical bank merger proposal. The proposed sale by way of merger takes place within a bankruptcy case. Bankruptcy sales by a trustee are typically "as is" final sales devoid of contingency clauses and walk away provisions. Moreover, the transaction proposed by Atlantic more closely resembles a hostile takeover and not the usual friendly merger situation which, according to Atlantic's own expert, is the norm in the banking industry.

---

4. On December 30, 1997, a complaint was instituted against Olympian Bank, *Allboro Waterproofing Corp. v. Olympian Bank*, AP No. 197–1614 (Bankr.E.D.N.Y.) seeking over $1.2 million in avoidable transfers. Whether or not Atlantic would invoke the Pending Litigation Clause provision of its offer in light of this lawsuit is not known. One thing, however, is clear. The invocation of that provision lies solely within the discretion of Atlantic.

Atlantic's recipe for swift merger approval is too simplistic. The board of directors of a corporation are guardians of the corporate welfare. Under New York law, in taking action involving or relating to a change or potential change in control of a banking institution, the board of directors shall be entitled to consider the following:

(i) the prospects for potential growth, development, productivity and profitability of the corporation;

(ii) the corporation's current employees;

(iii) the corporation's retired employees and other beneficiaries receiving or entitled to receive retirement, welfare or similar benefits from or pursuant to any plan sponsored, or agreement entered into, by the corporation;

(iv) the corporation's customers and creditors; and

(v) the ability of the corporation to provide, as a going concern, goods, services, employment opportunities and employment benefits and otherwise to contribute to the communities in which it does business.

N.Y. Banking Law § 7015(2) (McKinney Supp.1997–1998); see also N.Y. Bus. Corp. Law § 717(3)(b) (McKinney Supp.1997–1998).

In evaluating the duties of directors, New York courts adhere to the business judgment rule, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 1000 (1979); *accord Pollitz v. Wabash R. Co.,* 207 N.Y. 113, 124, 100 N.E. 721, 723–24 (1912). Thus, in a duty of care analysis, a presumption of propriety inures to the benefit of directors; absent a prima facie showing to the contrary, directors enjoy "wide latitude in devising strategies to resist unfriendly [takeover] advances" under the business judgment rule. *See Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264–65 (2d

Cir.1984) (citing *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380–84 (2d Cir. 1980); *Crouse–Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 701–04 (2d Cir.1980)).

Olympian Bank is a well run, profitable banking institution, experiencing growth, providing jobs, rendering services to its customers, and contributing to the communities in which it does business. The Trustee is not seeing ghosts and understandably anticipates fierce resistance to a takeover by Atlantic, a direct competitor of Olympian Bank. The Trustee's experience with Olympian Bank, its board of directors, and officers throughout this bankruptcy case point strongly in that direction. And, Olympian Bank can be a formidable adversary. *See In re Bakalis,* 199 B.R. 443 (Bankr.E.D.N.Y.1996).

It is well nigh impossible to predict the outcome of a battle to take over Olympian Bank by Atlantic.[5] Suffice it to say that whatever the ultimate outcome, it will take time. Significantly, Atlantic cannot even begin the process of getting regulatory approval, one of the many conditions to closing on its offer, until it first obtains merger approval by Olympian Bank's board of directors, whether the current board or some future one. Meanwhile, the Trustee holds a controlling stock interest in a profitable and growing banking institution at a time, according to undisputed testimony, that is most propitious to sell bank stock.

The future is uncertain and, not surprisingly, the Trustee wants to sell now. *See* 11 U.S.C. § 704(1). Uncertainty and delay in consummating the transaction with Atlantic are real possibilities. At the same time, Atlantic has the benefit of its various contingency clauses and walk away provisions. The Trustee is understandably unwilling to run the risk that after the dust settles in a merger battle, he is left with a devalued asset to remarket.

---

**5.** Whether or not Atlantic's Indemnity Fund of $500,000.00 would cover litigation expenses of the estate to obtain merger approval is something upon which this Court will not opine. The Trustee expressed the view that it may not be sufficient and for that reason sought an Indemni-

ty Fund of $1 million from Atlantic. In any event, Atlantic's Indemnity Fund is applicable only to actual litigation expenses and does not cover other expenses associated with obtaining merger approval. Such other expenses could also be substantial.

## B. Holdings' Good Faith Purchaser Status

Atlantic disputes the good faith purchaser status of Holdings. The challenge is rooted in Atlantic's claim that Holdings is an insider.[6] The asserted insider status of Holdings, according to Atlantic, arises from the four officers and directors of Olympian Bank who are among the fifty investors in Holdings, and because Richard Conti, the President and Chief Executive Officer of Olympian Bank, "spearheaded" the efforts of Holdings to purchase the stock held by the Trustee. Atlantic argues that the Board's Post–Conversion Resolutions chilled the bidding and particularly redounded to the unfair benefit of Holdings because its offer contemplated no change at Olympian Bank. Atlantic also charges Holdings and Mr. Conti with "extortionist conduct" and threats designed to intimidate the Trustee.

The claims of Atlantic, calling into question the good faith purchaser status of Holdings, do not withstand scrutiny. Preliminarily, however, a brief comment on the asserted insider status of Holdings is appropriate. We are not altogether convinced that the four officers and directors of Olympian Bank[7] who are investors in Holdings and Mr. Conti's[8] efforts on behalf of Holdings *ipso facto* confers insider status on Holdings. Atlantic has submitted no statutory or decisional authority for this proposition. In any event, assuming *arguendo* that Holdings is an insider, our conclusion that Holdings is a good faith purchaser under 11 U.S.C. § 363(m) renders this question moot.

Atlantic seems to be oblivious to the absence of any prohibition against insiders purchasing estate assets under § 363(b). It is not *"per se* bad faith" for an insider to purchase assets of a debtor, and "a sale to him without more would not suffice to show a lack of good faith." *In re Andy Frain Servs., Inc.,* 798 F.2d 1113, 1125 (7th Cir.

1986); *accord In re Wilde Horse Enters., Inc.,* 136 B.R. 830, 842 (Bankr.C.D.Cal.1991); *Apex Oil Co.,* 92 B.R. at 869–70.

The Bankruptcy Code does not define the meaning of "good faith purchaser". Recently, the Second Circuit in *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997), addressed the essential thrust of that term, stating as follows:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Id.* at 390 (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978)).

The affirmative focus is the probity of the purchaser's conduct during the course of the sales proceeding. In the instant case, there has been no showing of any untoward conduct by Holdings during the sales proceedings. Holdings entered a bid in the early summer of 1997 and quickly concluded arms-length negotiations with the Trustee. Since execution of the Stock Purchase Agreement on July 22, 1997, Holdings has complied with its obligations, which include establishing a stock purchase account, delivering account statements, and paying the 15% purchase price deposit. At the October 15, 1997 auction, Holdings complied with the bidding procedures and made new modifications to enhance its bid that were not previously discussed with the Trustee. Atlantic offered no evidentiary support whatsoever that Holdings or Mr. Conti engaged in extortionate conduct or threatened anyone. Nor did Atlantic offer any proof that the Trustee made his recommendation out of fear or intimidation. In sum, there is no reason to believe

---

**6.** Rarely does Atlantic even call its competitor "Holdings" or any other neutral nomenclature, but instead employs the label "Insider" in a transparent attempt to evoke a negative connotation.

**7.** Olympian Bank's board of directors have a total of thirteen members.

**8.** Mr. Conti is not one of the four officers and directors who are investors in Holdings. *See* Letter from Holdings to the Court (Dec. 15, 1997) (submitted in response to Atlantic's Post-hearing Memorandum, dated December 5, 1997).

that Holdings acted in bad faith during the course of the sales proceedings.

The larger overarching issue raised by Atlantic is whether Holdings and its allies engaged in *any* fraud, collusion, or attempt to take *grossly unfair* advantage of other bidders. Under *Gucci,* this formulation connotes "conduct [that] was intended to control the sale price or take unfair advantage of prospective bidders." *Id.* at 391. Only such conduct would work a forfeiture of Holdings' good faith purchase status.

In *Gucci,* disappointed, losing bidders for estate assets challenged the good faith of a winning bidder. The unsuccessful bidders argued that worldwide trademark litigation, which was pursued by the winning bidder in violation of the automatic stay, devalued those trademarks and enabled the winning bidder to purchase them at a reduced price at the bankruptcy sale. The Second Circuit rejected this argument, declaring "[w]e do not think the record shows that [the winning bidder's] litigation and alleged harassment campaign was specifically directed at controlling the sale price or taking unfair advantage of bidders." *Id.* Instead the Court held that the winning bidder's conduct constituted "an aggressive litigation strategy to protect its own trademarks from infringement" which was "a continuation of their established business strategy." *Id.*

Similarly in this case, Atlantic has made no showing that the activities of Holdings or its allies were "specifically directed" at controlling the sale price of the Olympian Bank shares or taking advantage of other bidders. It would seem far more likely that Holdings or its allies were driven by a desire to avert a takeover or to provide stability at Olympian Bank during the post-conversion period, a time of great uncertainty. To the extent, if any, that these activities affected the price of the bank shares or worked an advantage in favor of Holdings, such outgrowths would be deemed by-products or unintended consequences and would not, under *Gucci,* implicate the good faith purchaser status of Holdings.

## V. CONCLUSION

Based on all of the foregoing, we approve Holdings' offer to purchase the estate's stock interest in Olympian Bank and authorize the Trustee to take all appropriate and necessary steps to consummate that transaction.

The Trustee's motion for approval of an expense reimbursement agreement with Atlantic under the letter of intent, dated May 2, 1997, is granted. A similar expense reimbursement agreement incorporated in the Stock Purchase Agreement with Holdings is moot in light of our ruling that Holdings is the successful bidder.

***SETTLE ORDER.***