**Benjamin N. LAWSKY, Plaintiff,**

v.

**CONDOR CAPITAL CORP and Stephen Baron, Defendant.**

14 Civ. 2863 (CM)(JCF)

United States District Court, S.D. New York.

Signed December 23, 2015

Jonathan Lee Hochman, Andrew J. Melnick, Matthew Alan Katz, Richard Jason Bettan, Schindler Cohen & Hochman, Nancy I. Ruskin, New York State Department of Financial Services, New York, NY, for Plaintiff.

DECISION AND ORDER GRANTING MOTION TO CONFIRM SALE AND TO ENJOIN STEPHEN BARON FROM FURTHER INTERFERENCE WITH THE TRANSACTION

McMahon, UNITED STATES DISTRICT JUDGE.

Before the Court is the Receiver's motion to approve the sale of the assets of Defendant Condor Capital Corporation ("Condor"). Defendant Stephen Baron, whose misconduct in the management of Condor's business caused the New York State Department of Financial Services ("DFS") to institute this lawsuit and obtain the appointment of a Receiver, opposes the motion—although, having exercised his right to veto what would have been a more remunerative offer, it is far from clear that he has the ability to do so.

The Court relies for this motion on declarations submitted in connection with and in opposition thereto, the testimony at a hearing held on December 21, 2015, all exhibits attached to the moving and opposition papers, and also the Receiver's Declaration in opposition to Baron's motion for a preliminary injunction, which was filed with the Court last summer.

## STATEMENT OF FACTS

### I. The Complaint Against Condor and Baron

Condor is a New York-based sales finance company that services subprime automobile loans. Baron is Condor's sole owner and former chief executive officer.

On April 23, 2014, Benjamin M. Lawsky, Superintendent of DFS initiated this action against Baron and Condor. The gravamen of DFS's complaint is that Baron and Condor stole from their customers. They concealed their customers' positive credit balances on their accounts and refused to refund them their monies unless requested by a customer. They also endangered the security of their customers' personally identifiable information, placing them at risk of identity theft and other serious consequences. DFS alleged that Condor and Baron could no longer be trusted to service their customers' loans or handle their funds and data in a safe and lawful manner.

Accordingly, DFS sought equitable relief under the Dodd–Frank Wall Street Reform and Consumer Protection Act and various provisions under New York Financial Services Law and New York Banking Law. Specifically, DFS asked this Court to enjoin Condor and Baron from any future violations of these laws and appoint a federal receiver to take custody and control of Condor's property and operate Condor in a lawful and safe manner. The Court granted this application on May 13, 2014.

### II. The Receiver's Appointment

On that same day, this Court formally appointed a receiver ("the Receiver") and issued an order that identifies his duties

and obligations (the "Receivership Order"). Among other things, the Receivership Order grants the Receiver broad discretion to handle and manage all aspects of Condor's business. For example, the Receiver can liquidate or transfer any and all securities or commodities owned by or for the benefit of Condor, as he "deems to be advisable or necessary." Similarly, the Receiver can enter into contracts on behalf of Condor as he "deems to be advisable or necessary." The Receivership Order further provides that Baron shall not interfere in any manner, directly or indirectly, with the duties and obligations of the Receiver. The Receivership Order remains in force.

## III. The First Sale of Condor's Loan Portfolio

In the summer of 2014, the Receiver undertook to sell about half of Condor's loan portfolio. The main purpose for this sale was to pay off Condor's debt to a creditor. In short order, the Receiver selected a buyer to purchase this portion of Condor's loan portfolio for 92% of the unpaid balance of certain receivables. The Receiver deemed this proposed sale to be in the best interests of Condor. Then, as now, Baron communicated to the Receiver that he objected to the terms of the proposed sale. This Court ultimately endorsed this proposed sale, noting, "It appears to me that the Receiver is following the most prudent course available." Regarding the Receiver's discretion, this Court issued an order on November 6, 2014 that reaffirmed the Receiver's "absolute discretion to dispose of assets of Condor."

## IV. The Final Consent Judgment

On December 22, 2014, DFS and Baron executed the Final Consent Judgment, which resolved DFS's litigation with Baron and Condor. The Final Consent Judgment called for Condor and Baron to pay a civil monetary penalty of $3 million and for Condor to make restitution payments to its customers. In addition, the Final Consent Judgment required the Receiver to sell the remainder of Condor's loan portfolio (a condition to which Baron consented).

The Receiver was not a party to the Final Consent Judgment and did not participate in the negotiation of its terms and conditions. However, certain of its terms restrict his freedom of action.

In particular, the Final Consent Judgment ensures that Baron does not regain control of the business of Condor. It requires the Receiver to sell the remaining loan portfolio to an independent third-party purchaser and to structure the deal in a manner that minimizes the risk that Baron will exert influence over these loans.

Although Baron consented to the sale of Condor's assets, he was given one opportunity to veto a binding Letter of Intent proposed by the Receiver (which his lawyer referred to as being akin to the exercise of a peremptory challenge). He also has the right to consult with the Receiver about the pending sale of Condor's loans, but "shall not interfere with the Receiver's negotiations for the sale or the effectuation of the sale of Condor's loans, including but not limited to providing all documentation and information requested by the Receiver, and complying with the Receiver's instructions concerning the sale of Condor's loan portfolio." (Ex. 4 at 9.) This particular provision of the Final Consent Judgment is critically important, because, were this Court to grant the Receiver's motion authorizing the sale to be concluded, Baron would be in contempt of court unless he executed any and all documents needed to close the deal—including, if required, a covenant not to sue the Buyer or the Receiver to try and frustrate the deal.

The Consent Judgment included a 120 day window for the consummation of the sale of the loan portfolio. It was entered a year ago. The fact that the deadline is now eight months in the past has principally to do with Baron.

## V. The Sale Process for Condor's Remaining Loan Portfolio

On December 22, 2014, the very day the Final Consent Judgment was signed, the Receiver began soliciting bids for the sale of Condor's remaining loan portfolio. In so doing, the Receiver made it known to potential bidders that he preferred up-front cash payments as consideration for these loans. Baron communicated to the Receiver that he disagreed with the Receiver's discretion as to how the winning bid should be structured; he wanted the winning bid to consist mainly, if not entirely, of periodic compensation tied to the future performance of the loan portfolio.

On January 21, 2015, the Receiver received a bid from an entity identified in the preliminary injunction decision as "the Losing Bidder," now known to be the loan servicing company First Associates Loan Servicing LLC ("FALS"). The Receiver had two principal concerns about this bid. First, it was payable pursuant to a nonrecourse promissory note issued by a special purpose entity established by the loan servicing company—which is to say, Condor would have no ability to collect from anyone if FALS defaulted. Second, it did not include an up-front payment, but was payable solely from the future proceeds from the loan portfolio—i.e., the structure favored by Baron, but not the Receiver or DFS. In effect, FALS's "bid" was merely a servicing proposal, not a sale, with Condor retaining all the economic risk, as well as the benefits, from the remaining login portfolio. The Receiver communicated these concerns to Baron's legal counsel during a February 4, 2015, telephone call.

On February 25, 2015, Baron submitted a letter to this Court asking that the Court direct DFS not to object to a sale of Condor's remaining portfolio to FALS. DFS and the Receiver both responded by letter, highlighting that the Final Consent Judgment requires that the structure of the sale must ensure that Baron exerts no influence, directly or indirectly, over the servicing of the loan portfolio moving forward. DFS took the position that a transaction in which Baron retained 100% of the economic risk and benefit of the portfolio's performance would not comply with this requirement. On February 26, 2015, the Court rejected Baron's arguments and refused to grant him the relief that he requested, noting that Baron had the right under the Final Consent Judgment to veto one binding Letter of Intent.

After this further instruction and support from the Court, the Receiver continued to analyze potential bids through March and April 2015. On April 24, 2015, the Receiver officially rejected FALS's offer and entered into a binding Letter of Intent with an alternate bidder, who had offered a more traditional, market-based offer consistent with the stated preferences in the Receiver's request for bids. On April 29, 2015, Baron formally exercised his one and only veto to cancel this pending Letter of Intent. The Court is constrained to note that, had this sale gone through, Condor would be in far better financial shape than it is today—or than it will be upon the sale of the rest of the portfolio. So in essence, Baron cost himself money by objecting to this sale.

Under the terms of the Final Consent Judgment, the Receiver now had sixty days to restart the bidding process and select another purchaser for the remaining loan portfolio.

## VI. THE RECEIVER AGAIN SOLICITS BIDS FOR THE SALE OF CONDOR'S REMAINING LOAN PORTFOLIO

On or around May 5, 2015, the Receiver commenced another round of bids for the sale of Condor's remaining loan portfolio and contacted fifteen potential bidders. (Ex. 55.) Among other things, the solicitation letter specifically asked whether the bidders were willing let Condor keep any interest that accrued on net cash payments received between the date when the risks of the transaction shifted from Condor to the Buyer (the "Cut Off Date") and the date of closing (the "Closing Date").

After a series of communications, the Receiver received five Letters of Intent from prospective purchasers, including FALS (again) and the Successful Bidder, now known to be Och–Ziff ("O–Z"). (*Id.* ¶¶ 42–43.)

FALS's bid was deficient in the opinion of the Receiver for essentially the same reasons as its original offer. (Receiver Deck Ex. 10.) Although the legal form of the transaction was structured as a sale, the economic substance of the transaction was a transfer of the servicing of the loan portfolio to FALS in exchange for servicing fees, with Condor retaining all the economic risk and benefit. To minimize the risk that Baron might interfere with the servicing of these loans, FALS offered to have a court-approved monitor or portfolio supervisor oversee Baron's compliance under the Final Consent Judgment. The Court has absolutely no interest in continuing its ongoing monitoring of this business, or in paying a monitor to do so.

The Receiver carefully considered FALS's offer and enlisted his financial consultants to evaluate the bid. He concluded that it contained the facially highest purchase price, but only as long as the loan portfolio met certain performance metrics over the next four to five years. The bid was structured to provide no upfront consideration—all future, periodic payments were completely contingent upon the future performance of Condor's remaining (i.e., delinquent) loan portfolio. Condor's loan portfolio has not hit the benchmarks recently, which exposes the weaknesses of the offer. (Arango Decl. ¶ 4.)

## VII. THE BINDING LETTER OF INTENT WITH THE SUCCESSFUL BIDDER

On June 12, 2015, the Receiver received a Letter of Intent from the Successful Bidder, OZ. He executed it on June 15. (Ex. 5.)

The deal as originally contemplated called for O–Z to acquire "all of the Portfolio receivables" (i.e., all of Condor's remaining loans) in exchange for 47% of the unpaid principal balance ("UPB") as of the Cut Off Date (which was proposed, in the Letter of Intent received from O–Z, to be April 30, 2015). This amount is referred to as the Cash Purchase Price. The Due Diligence Period was set for the weeks of June 15 through 26, and closing was contemplated for July 15, 2015.

The parties contemplated that the Cash Purchase Price would be adjusted at the closing based on any due diligence findings that might affect the anticipated value of the portfolio (Ex. 5 ¶ 1.B.) The parties further agreed to a "customary post-closing true-up to effectuate any differences in the purchase price due to the reduction in the principal balance of the Portfolio Receivables due to payments or write-offs." (*Id.*) I am advised by Mr. Baron's expert, Fiachra O'Driscoll, that, in a more normally structured deal, the parties would simply remove problem loans that were identified during due diligence from the sale

portfolio; but because the Receiver was interested in the sale of the entire portfolio, it was certainly within his business judgment to agree that there would be a price adjustment if due diligence turned up problem loans. In the end, as we shall see, due diligence turned up so many problems that the Receiver ended up having both to adjust the price and to remove some loans from the sale because O–Z simply would not deal with them!

Based on Condor's loan portfolio balance as of May 31, 2015 (the date on which a discounted cash flow analysis was performed for this Court in connection with Baron's unsuccessful motion for a preliminary injunction), and assuming no problems turning up during due diligence, the parties anticipated that O–Z would pay Condor approximately $70 million in upfront compensation. From and after the Cut Off Date, O–Z would be entitled to receive net collections on the portfolio loans (which everyone agrees is customary in transactions of this sort), and would assume the risk of non-collection, bankruptcy, loss of collateral, and the like. This amount would be netted against the Cash Purchase Price at closing,[1] so that the amount Condor would receive would be reduced by the Net Collections during the period between the Cut Off Date and the Closing Date (which, as noted above, was anticipated to be about six weeks at the time the deal was cut).

As additional periodic post-closing compensation, if the loans met certain benchmarks, the excess of collections over the benchmarks would be divided 70% to O–Z and 30% to Condor.[2]

The Letter of Intent was binding on Condor, initially through July 15, 2015 (the anticipated date of closing, which was the initial "Exclusivity Date"). That date was later extended on multiple occasions as a result of the problems that will be discussed below. During the Exclusivity Period, the Receiver could not discuss or consider alternative deals.

As might be expected given the condition of the portfolio and the way Baron had chosen to run his company, the Letter of Intent gave O–Z numerous "outs," including approval by its investment committee and certain due diligence outs. DFS also had the right to reject the bid. It has not done so; indeed, it enthusiastically endorses the bid.

Not surprisingly, given Baron's litigiousness, at the insistence of the buyer, the deal required court approval; additionally, O–Z had to receive "either by way of a court order or other written agreement a release and covenant not to sue from Seller, Stephen Baron and any of their respective affiliates, representatives, successors and assigns (the "Release")" as a condition of closing. (*Id.* ¶ 6(h).)

In the opinion of the Receiver as of last June, O–Z's offer was less risky and of more value to Condor than FALS's, even though it was not facially the highest bid. (*Id.* 50–56.) The Receiver also concluded that DFS, which had the right to veto an

---

1.  Whether O–Z pays the full Cash Purchase Price and Condor cuts it a check for the net collections or O–Z reduces the Cash Purchase Price by the amount of the net collections is of no moment, since the net effect is the same.

2.  The benchmarks were defined as 15% of Internal Rate of Return ("IRR") and 115% of Multiple of Invested Capital ("MOIC"), each measured as the sum of net cash collected from and after the Closing Date and the net pre-closing proceeds that were turned over to the Buyer at closing (or netted against the Cash Purchase Price, however the parties chose to handle the matter of payment). This means Condor has the potential to reap some benefit from net collections between the Cut Off Date and the Closing Date.

offer, was likely to approve the sale, as required by the Final Consent Judgment. (*Id.* ¶ 30.) In this assessment he was plainly correct.

Though having no right to veto the Proposed Sale, on June 29, 2015, Baron filed papers in support of an application for an injunction restraining the transaction (his lawyer refers to this as the equivalent of a "challenge for cause"). This Court denied the motion for a preliminary injunction, and also denied Baron's application for a stay pending appeal. (*See* Decision and Order, Docket # 205). Baron moved before the Second Circuit for a stay pending appeal; his motion was denied on August 19, 2015 without comment. Baron did not seek to expedite the appeal, and it is not yet fully briefed; it will be heard some months from now.

## VIII. The Instant Application

The original Letter of Intent had set the Closing Date for July 15, 2015. The preliminary injunction motion and associated stay litigation did not conclude until August 19, so that closing date came and went.

However, while litigation was pending, O–Z undertook the due diligence contemplated by the Letter of Intent. To say that it did not much like what it found was an understatement. Four principal problems were identified:

1. Condor illegally overcharged fees to customers for late payment fees, for use of credit card payments taken over the telephone and for "bounced" checks. The remediation of these loans took several months, included dealings with numerous state regulators (these were not

New York loans, so DFS had no interest in them), and resulted in a price adjustment, as anticipated by Section 1.B of the LOA, of $4.25 million.

2. Condor had never written down on its books the value of loans that were crammed down in borrower bankruptcies; the only record of these cram downs was apparently to be found in handwritten notes made by the in-house servicers in the loan files themselves. The parties eventually determined that this would require a further $2.2 million price adjustment; as there was no automated way to make the corrections, they had to be done by hand.

3. Miscellaneous adjustments had to be made for terminated or cancelled loans that were identified and insurance and lien losses that incurred prior to the Cut Off Date. These adjustments knocked just under $700,000 off the Unpaid Principal Balance, and so off the Cash Purchase Price.

4. Some loans in the portfolio were so bad that O–Z simply refused to take responsibility for them; eventually, the parties agreed that these loans would be removed from the portfolio and sold separately. The parties negotiated a $2.5 million credit to the Unpaid Principal Balance for this "Charged Off Loan Portfolio."[3]

The total amount of these adjustments to the Unpaid Principal Balance was $7.2 million; this reduced the anticipated Cash Purchase Price to $64.3 million.

---

3. The Receiver advises that he presently has two bids for these loans, one of which will net the full $2.5 million and one about $100,000 less. In either case, the collections on those loans from and after the Cut Off Date are the property of Condor; O–Z has absolutely no claim to them.

From and after the time the litigation risk dissipated (which is to say, after this Court refused to enjoin consummation of the deal and the Court of Appeals declined to enter a stay pending appeal), O–Z threatened to walk away on multiple occasions, due to the degradation of the portfolio, the size of the necessary remediations and the threat of being embroiled in endless litigation with Baron. As a result, the parties negotiated a series of holdbacks. In addition to a fairly standard $1.5 million holdback for any breaches of warranties and representations, there was a $2 million holdback for litigation risk, a $1.8 million holdback to cover the cost of any further unanticipated remediation that the portfolio might require and a $500,000 holdback to cover the cost of any penalties that Condor might have to pay as a result of Baron's illicit activities in the various states where illegal collections had taken place. The total of the holdbacks is $5.8 million, but should these monies not be needed (because remediation is complete, because no penalties are assessed, or because Baron does not embroil O–Z in lawsuits) they will eventually revert to Condor.

While remediation and the negotiation over the necessary price adjustments and holdbacks was going on, the Receiver held the deal together by agreeing to extend the Exclusivity Date, from July 15 to September 22, and eventually to October 16, 2015. (Ex. 54.) The effect of these extensions was that the Receiver was unable to shop or walk away from the deal until October 17, 2015, as long as O–Z adhered to the terms of the Letter of Intent. The Receiver was able to negotiate an extension of the Cut Off Date to May 31, 2015, which yielded about $8 million more in collections for Condor than it would otherwise have had to allocate to O–Z.

In his testimony, the Receiver quite frankly acknowledged that, in addition to the time-consuming activity of litigation and remediation, there was another impediment to getting the deal done: O–Z took its time completing its due diligence and finishing the remediation. As a result, the final Exclusivity Date passed without a purchase agreement being signed. At that point the Receiver had to balance the cost and effort of rebidding the deal, and the additional Receivership and legal fees, as well as the additional hurdle of obtaining DFS approval for a new bidder, against the possibility that rebidding the deal would not yield a better net price than he already had. He also had to weigh the possibility that O–Z would walk away from the deal if he demanded any change in its fundamental terms—including, notably, the date on which risk passed from Seller to Buyer. The Receiver testified at the hearing that he knew that any change in the Cut Off Date would be unacceptable to O–Z, because it would reduce the deal below the size that O–Z's portfolio committee found acceptable;[4] thus would give O–Z grounds to renege on the Letter of Interest and walk away from the deal.

The Receiver concluded that a bird in the hand was worth two in the bush, and so pressed O–Z to sign the Portfolio Purchase Agreement—to the point that he threatened to walk away from the deal himself if it were not done by Thanksgiving. The parties finally signed a Portfolio Purchase Agreement (PPA) on November 23, 2015. The Court received this motion on November 24. Briefing on the motion concluded in the ordinary course on Friday, December 11, 2015. An order would

---

4. The Court did not have the benefit of the transcript when writing this opinion. My memory and notes reflect that the Receiver testified that the parameters were deals in the $50–$100 million range.

have been signed two weeks ago but for Baron's opposition to approving the deal.

The deal enshrined in the PPA satisfies DFS's mandate that Condor's business be sold to a third party Baron will not control.[5] With final adjustments, and assuming it is not necessary to tap into the holdbacks (i.e., no litigation, no breaches of reps and warranties, no additional remediation costs), O–Z will pay approximately $64.3 million, which is 47% of the unpaid principal balance as of May 31, 2015 as adjusted for due diligence findings—all as plainly anticipated in the Letter of Intent.

The $64.3 million is substantially less than the amount realized in the sale of the first batch of loans (the November 14, 2014 sale), where the buyer paid 92% of the unpaid principal balance; the difference is accounted for by the fact that the second batch of loans are distressed, while the loans sold on November 14, 2014 were non-delinquent.

$64.3 million is also less than the $70 million that the deal was anticipated to bring in last June, when the court first learned of it, but since the Letter of Intent that was presented to the Court last summer anticipated the potential for these adjustments, they are not entirely surprising.

What could not have been anticipated last summer was the long gap between the Cut Off Date and the Closing Date. O–Z gets to keep the net collections on the portfolio loans from and after the Cut Off Date of May 31, 2015. Had the deal closed as scheduled in July—even at the end of July, right after this court denied the motion for a preliminary injunction—Condor's "take-home" would have been reduced by $12 million, from $64.3 million to $52 million, to account for these collections.

Through the end of October, that number is just under $28 million; the Receiver estimated that, were the sale to close by the end of December, the net amount realized from collections could increase to as much as $36 million.

Of course, O–Z ran the risk that collections would not be robust during this period, and that loans would go into default or collateral would be lost; the court has no idea how much more O–Z would have realized if all the loans had been made current during that period (in fact, the sale portfolio loans averaged 93 days past due, although some borrowers made partial payments as and when they could). However, the long gap between the Cut Off Date (when the risks and rewards of the portfolio shifted to O–Z) and the Closing Date (which has yet to occur) has the practical effect of decreasing the Effective Purchase Price for the portfolio. Again assuming a December 31 closing date (and the eventual refunding of all holdback amounts), Condor will net, not $64.3 million, but $28.3 million.

I emphasize that there has been no change whatever in the economics of the deal; it is exactly the deal the parties memorialized last June in the Letter of Intent. The sale was "as of" a Spring 2015 Cut Off Date, and the Buyer agreed to pay 47% the portfolio on that date (with adjustment after due diligence). Indeed, because the Receiver insisted that the Cut Off Date be the same date as the date of the discounted cash flow given to the court, the deal is actually $8 million more favorable to Condor than the deal outlined in the Letter of Intent. But simply because of the passage of time, there has

---

**5.** Specifically, the Final Judgment directs the Receiver to "structure the sale of Condor's loans in a manner that ensures Stephen Baron shall exercise no influence, directly or indirectly, over the servicing of these or any other loans at any present or future time." (Ex. 4 at 7.)

been a sea change in the amount that Condor will take home after the closing.

There has been one other change during the last few months: the Receiver transferred the management of the portfolio to FALS, after first hiring it as the back-up servicer in August 2015. Baron triumphantly points out that FALS was the servicer that would have been used to service and execute the deal he preferred when he tried to stop negotiations with O–Z. However, that deal is not on the table; the issue before the court is whether the Receiver has breached his fiduciary duty to Condor by proposing to go forward with the O–Z deal.

## IX. Baron's Objections to the PPA

On December 7, 2015, Baron filed an opposition to the motion to approve the proposed sale. He objected to the deal on multiple grounds: to the various adjustments that have been made to the UPB; to the holdbacks; and above all to the Receiver's failure to demand that the Cut Off Date be renegotiated.

Condor's opposition was accompanied by an affidavit from O'Driscoll, a partner in KFSP Investments who has extensive experience arranging and underwriting new issues of prime and subprime auto loan asset-backed securities and in preparing sale and servicing agreements for closed-end loans sales, like the PPA at issue in this matter.

O'Driscoll testified that there were three abnormal aspects to the deal that rendered it commercially non-standard: (1) the extended period (presently seven months and counting) between the Cut Off Date and the Closing Date (which, per the PPA, is no later than five days after the court approves the deal, with the possibility for one extension of as much as 60 days) is well beyond the standard period for such gaps; (2) the risks between the Cut Off

Date and the Closing date remained with the seller, while the rewards went to the Buyer; and (3) the various holdbacks deviated from standard industry practice and should have been no more than 5% of the proceeds at closing; instead, they were substantially greater, meaning that Condor retained all the risks a purchaser would ordinarily assume on the Cut Off Date.

Baron demanded and was granted an evidentiary hearing to deal with his objections to court approval of the sale; at the hearing, O'Driscoll further explained his second objection by stating that, in the ordinary course, the Letter of Intent would not have provided for a price adjustment for loans that were found to be deficient during due diligence; rather, they would have been removed from the sale altogether, in much the way the $2.5 million in really bad loans were removed from the portfolio.

## X. The Receiver's Written Response to Baron's Argument

The Receiver filed a responsive declaration outlining his rejoinder to Baron's objections.

The Receiver first went over his objections to the deal that Baron has always preferred—a transaction involving FALS, the company that has been servicing the loan portfolio since early in the fall of this year. In the opinion of the Receiver, the FALS transaction did not provide for a market-based sale with an assumption of the risk by FALS. The Receiver notes that this Court had already rejected Baron's argument that he breached his fiduciary duty by not accepting the FALS offer.

The Receiver is quite correct; it is law of the case that he did not breach his fiduciary duty by rejecting FALS's offer many months ago. But that is beside the

point. The issue on the table is whether I can approve the sale to O–Z today. That question does not implicate, let alone call into question, the Court's previous ruling. Put otherwise, even if the Court were not to approve this sale, the Receiver would still not have breached his fiduciary duty by rejecting a deal that provided for no up-front money and no meaningful recourse in the event of the "buyer's" default, and that DFS was not going to approve in any event. The current deal stands or falls on its own merits. It looked like a good deal six months ago; the question is whether something has changed in the intervening period that alters the court's ability to confirm it.

The Receiver then turned to Baron's objections to the deal contemplated by the Letter of Intent. The Receiver justified the price reductions for both the loans that were taken out of the portfolio ($2.5 million, with Condor retaining all the benefits of owning those loans and the proceeds from their anticipated sale) and the portfolio as it ended up. As for the holdbacks, the Receiver did not disagree with O'Driscoll that three of the four (for litigation, remediation and interference penalties) were unusual; indeed he admitted that they were "unique to the Sale." However, he insisted that, "Standard industry practice is largely irrelevant to the Sale because of Condor's and Baron's prior misconduct ... Condor's systematic, knowing, and abusive theft of funds from customers and Condor's deceptive, unfair, abusive treatment of its customers." He specifically noted the far-from-standard requirement in the Final Judgment (to which Baron consented) that he sell the loan portfolio "... in a matter than ensures

Baron will not interfere with the servicing of the loan portfolio now or ever again." (O'Connor Supp. Decl. ¶ 24.) And he noted that the one non-unique holdback, for breach of warranties and representations, was "well within" O'Driscoll's "customary holdback" range of 5% of the proceeds at closing. (*Id.*)

The Receiver also noted that the holdbacks are just that—holdbacks—which may revert to Condor (and so to Baron) if they are not needed for future remediations or litigation costs.

As for the Cut Off Date, the Receiver pointed out that the deal is no different that the deal set out in the Letter of Intent—which, as noted above, is technically correct. He blamed Baron for the many months of delay in closing. He noted that no buyer in his right mind would have closed until the stay pending appeal issue was resolved, which means that realistically there could be no closing until the end of August. With this I cannot possibly quarrel; the proposition is self-evident. And he observes that his efforts to get the PPA signed and the deal closed were frustrated because the Purchaser's due diligence revealed so many unanticipated problems with the loan portfolio. He described the amount of time needed to make these corrections (which included working with state regulators in multiple states) as "inordinate," and I find that description to be completely credible, especially because the computer systems at Condor are deficient, so all necessary adjustments had to be performed manually.[6]

The Receiver also disputed O'Driscoll's assertion that the risk of the deal had not been transferred to the Buyer along with the rewards. O'Driscoll had testified that

---

6. The Receiver, who concentrated his efforts on selling the portfolio rather than renovating business operations—as was his right once he examined the business and concluded that

liquidation was the best option—cannot be faulted for the deplorable state of Condor's business systems.

it was customary for purchasers of loan portfolios to agree that interest on collections between the Cut Off and Closing Dates ("accrued interest") would inure to the benefit of the Seller. The Receiver and his partner Mercedes M. Arango, who submitted an affidavit to respond to O'Driscoll's testimony, testified that they solicited bids including accrued interest (Ex. 56), but not a single person who submitted a Letter of Intent offered that concession. Arango disputed O'Driscoll's conclusion that O–Z had not assumed the risk of collections from receivables as of the Cut Off Date (although to the Buyer's great good fortune, collections have been very lucrative recently). Arango also testified that O–Z had assumed all risks associated with loan defaults as of the Cut Off Date.

To the obvious question—did he try to renegotiate the basic terms of the deal, and in particular the Cut Off Date?—the Receiver said no, because he was afraid the purchaser would walk and he would be left to start the whole costly and time consuming process all over again. He so testified in both his original and supplemental declarations in support of his motion; he reinforced that testimony during the hearing on his application. The Receiver has indicated to the court on multiple occasions that Baron's litigiousness scares away potential buyers and makes it difficult to negotiate deals. I credit this.

## XI. The Hearing

Little was added to the record at the hearing, which was held on December 21, 2015. The Court deemed the two declarations of the Receiver, the declaration of Arango, and the affidavit of O'Driscoll to be their direct testimony, and they were subject to cross examination and to questioning by the Court. I think it fair to say that no one wavered from the position s/he

took on paper. Notably, the Receiver testified that he believed the sale under the PPA provided Condor the best available transaction consistent with the terms of the Final Consent Judgment. DFS stated that it believes that the structure of the transaction is consistent with the requirements of the Final Consent Judgment and approval of the PPA is in the public interest.

## DISCUSSION

■ The Receiver moves for an order approving the sale of Condor's loan portfolio and an order enjoining Baron from asserting further claims related to the sale against the Receiver and the buyer of the loan portfolio. The Receiver argues that the Court should approve the sale because it "has complied with the sales procedures under the Final Consent Judgment," and because, acting consistent with its fiduciary duty, "the Receiver reasonably believes that the sale is the best deal for Condor." (Receiver's Br. at 9, 10.) Further, the Receiver argues that the Court should enjoin future litigation relating to the sale, lest Baron continue to "frustrate[ ] the objectives of this Court and the DFS" via "baseless litigation." *Id.* at 14-15.

The motion is granted in all respects.

## I. The Court Approves the Consummation of the Sale

The law does not impose any requirement that the Court approve the sale of the loan portfolio, but the parties have imposed such a requirement by contract. The Letter of Intent and the PPA both provide that, as a condition to closing, the Court must enter an order in substantially the form attached to the PPA as Exhibit H. This proposed order requires the Court to affirm four things: (1) the Receiver is authorized, on behalf of himself and Seller, to enter into, and cause Seller to enter

into, and be bound by, the PPA, and to consummate and cause Seller to consummate, all transactions necessary to complete the sale and conveyance pursuant to the terms of the PPA; (2) the Conveyed Property is delivered free and clear of all Liens; (3) the sale;[7] and (4) on and after the Closing, the Contracts and Conveyed Property are no longer the property of the Seller and no longer subject to the control or jurisdiction of the Receiver or the Court, and no longer part of the estate of the Receiver.

■ To approve the sale of Condor's assets, the Court must "expressly find from the evidence presented before [the Court] at the hearing a good business reason to grant such an application." *Equity Sec. Holders v. Lionel Corp. (Lionel)*, 722 F.2d 1063, 1071 (2d Cir.1983). This is not, however, a high bar, even when the trustee is liquidating the estate. All the Receiver is required to establish is that there are sound business reasons for selling assets and for accepting the offer he selected. Once he makes such a showing, the Receiver's determination that accepting the offer is in the best interest of Condor Capital is owed deference under the business judgment rule. *See Golden Pac. Bancorp v. F.D.I.C.*, No. 95 CIV. 9281, 2002 WL 31875395, at *9 (S.D.N.Y. Dec. 26, 2002) ("Receivers, just like corporate directors, are entitled to the deference of the business judgment rule in their decision-making concerning the management of a corporation.") *aff'd sub nom.* 375 F.3d 196 (2d Cir.2004). As Baron noted in his brief, that deference is not unfettered; however, for the court to approve a sale, the trustee or receiver merely needs to justify it. *See Lionel*, 722 F.2d at 1063.

In *Lionel*, the Second Circuit Court of Appeals held that a trustee has the burden of establishing that there are sound business reasons for approving a proposed estate sale. Once the trustee has done so, the business judgment rule mandates that her decision be given proper deference. In *Lionel*, the trustee's only stated reason for selling a debtor's stock interest was the insistence of creditors; according to the court, this was "insufficient as a matter of law because it ignore[d] the equity interests required to be weighed and considered under Chapter 11." *Id.* The court held that the trial court's approval of a sale was an abuse of discretion as a result.

By contrast, the Second Circuit affirmed a bankruptcy court's approval of an asset sale in *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir.1992) because it was supported by good business reasons, specifically the risk that delay would reduce the value of the assets, the debtor's need for cash, and the opportunity to get a high prices for the assets. *See also In re Bethlehem Steel Corp.*, No. 02 CIV. 2854, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) (affirming bankruptcy court's authorization of reimbursement of employees' union's professional fees and expenses, because union's participation in evaluating and negotiating a restricting plan was a good business decision); *but see, In re Mannone*, 512 B.R. 148, 154 (Bankr. E.D.N.Y.2014) (holding that trustee failed to meet his burden to establish business justification for proposed sale where creditors were to receive no benefit from proposed sale).

■ Contrary to Baron's contention that a receiver's duty in liquidating an estate "is straightforward: to maximize the price for the property" (Def. Br. at 19) a

7. I confess that I am not quite sure what it means to "affirm ... the sale." The most I can do is decide whether the decision to consummate the transaction would violate the business judgment rule; that constitutes "court approval" of the sale.

trustee is not obligated to mechanically accept the highest offer. As the First Circuit noted in *In re Muscongus Bay Co.*, 597 F.2d 11 (1st Cir.1979), "[T]here are certain circumstances in which the best interests of the estate and creditors may warrant a bankruptcy court's refusal to confirm" the highest bid at auction. Trustees routinely consider factors aside from the total dollar amount offered, and courts approve sales as long as the trustee used reasonable business judgement in weighing the terms of competing bids. *See, e.g., In re Bakalis*, 220 B.R. 525, 532 (Bankr.E.D.N.Y.1998) (deferring to a trustee's judgment that an offer was most advantageous to the estate, after trustee "convincingly articulated the reasons for recommending the bid" and "supported his reasoning at the subsequent evidentiary hearings").

None of the cases cited by Baron says otherwise. For instance, the bankruptcy court in *In re Bakalis*, cited by Baron, approved the sale of assets to the second highest bidder, since the bidder whose offer was $700,000 (or 6%) higher had insisted on several contingency and walkaway clauses. *In re Bakalis*, 220 B.R. at 532. While the case states that a trustee has a duty to "maximize the value obtained from a sale, particularly in liquidation cases," it also states that a trustee must consider other factors, including avoiding undue risk. *Id.* The court there noted approvingly that, "The Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid." *Id.* In *Jackson v. Smith*, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418 (1921), the court held that the trustee violated his fiduciary duty when he had personal interest in selling property entrusted to him for lowest price possible. There is no such suggestion here.

In *Fleet Nat. Bank v. H & D Entm't, Inc.*, 926 F.Supp. 226, 245 (D.Mass.1996), also cited by Baron, the court held that the duties of a court-appointed receiver are "framed by the task he or she is ordered to accomplish." Here, the Receiver was entrusted with a company whose sole owner had run it with utter indifference to legalities. The Final Consent Judgment between that owner and the State of New York required not only that the assets of the corporation (subprime consumer auto loans, granted to financially insecure borrowers) be sold, but that they be sold in such a way that the owner—Baron—could not have any influence over how those assets were managed. The Receiver testified that he believed himself constrained by two separate duties—to get the best price for the loans, and to do so in a way that kept Baron on the outside looking in—and that the latter duty might impede his ability to get top dollar for Condor's assets. The Receiver happens to be correct that he is so constrained. I credit his testimony that, as a result of the terms of the Consent Final Judgment and the condition of the loan portfolio, the transactions into which he can hope to enter, especially for the portfolios underperforming and nonperforming loans, are unlikely to be commercially standard. I am therefore satisfied that it is not necessary for those terms to satisfy some "commercially standard" requirement in order to find that the Receiver exercised business judgment in connection with his acceptance of the O–Z deal.

With that law in mind, we turn to the deal that is on the table.

■ . There are sound business reasons for selling the assets; indeed, the Final Consent Judgment requires it, and DFS has concluded that the sale to this particular buyer is in the public interest. Baron has consented to the sale of the assets, and

to DFS' right to approve the purchaser, so he cannot complain about any of that.

Baron states three objections to the terms of this particular sale:

1. The purchase price has been reduced since the court first refused to enjoin the deal;

2. The holdbacks are unreasonable; and

3. The Receiver's refusal either to renegotiate the Cut Off Date or to walk away from the deal violates his fiduciary duty and does so for the sole purpose of punishing Baron.

The first two of these objections are easily dealt with.

Baron offers no evidence tending to show that any of the reductions in the purchase price that were occasioned by due diligence findings are unreasonable. The Letter of Intent as originally presented to the court contemplated that the Cash Purchase Price to which the parties originally agreed ($70 million) would be adjusted as mutually agreed based on due diligence findings. That means the parties to the Letter of Intent—the Receiver and O–Z—anticipated that it might be necessary to adjust the Cash Purchase Price, and made provision therefor. Months ago, the Court concluded that the terms of the deal set out in the Letter of Intent fell well within the Receiver's business judgment. That is the law of the case, and I am not about to change my mind.

It is undisputed that due diligence uncovered substantial problems with the loan portfolio—including illegal collections from impoverished subprime borrowers in violation of various state consumer protection laws, as well as failures to write down loans on Condor's books after they had been crammed down in bankruptcy. The nature and extent of these problems were not known to the Receiver or to O–Z prior to the signing of the Letter of Intent. That is precisely the scenario contemplated by Section 1.B of the Letter of Intent—if due diligence turned up such problems, the parties would negotiate a price reduction.

O'Driscoll testified at the hearing that reducing the purchase price, as provided in Section 1.B of the Letter of Intent, was not the commercially standard way to deal with adverse due diligence findings. Rather, eliminating those loans from the sale portfolio was commercially standard. But O'Driscoll ignores two things. First, the Receiver was charged by the terms of the Final Consent Judgment with *selling the loans*. If reducing the purchase price rather than eliminating loans from the sale would get the loans sold, the Receiver's choice to proceed in that manner was entirely reasonable and well within his business judgment. Second, the reasonableness of this particular term in the Letter of Intent was ruled on six months ago. Had it any merit (which it does not), Baron's objection comes too late.

Neither O'Driscoll nor anyone else offered so much as a scintilla of evidence that the amount by which the UPB, and hence the Cash Purchase Price, were reduced in order to deal with these problem loans (a total of $7.2 million) was calculated erroneously, or was inflated, or was otherwise unreasonable. I thus have no evidentiary basis to conclude that the Receiver breached his fiduciary duty by agreeing to these specific price reductions.

As for the loans that were so bad that the Buyer simply refused to purchase them (the Charged Off Loans): they had to be removed from the portfolio, with a price concomitant adjustment. (Indeed, according to O'Driscoll, this was the "commercially standard" solution.) There is no evidence that the valuation placed on the Charged Off Loans ($2.5 million) is out of line; to the contrary: the Receiver testi-

fied without contradiction that he has is selling the Charged Off Loans separately, and that he has two new bids for them— one of which is for the full $2.5 million, and one of which is very close to that amount. That is the only record evidence of the value of the Charged Off Loans. Until the Charged Off Loans are sold, all collections in respect of these loans belong to Condor. They are not being held for O–Z's account.

In short, Baron has not identified any harm Condor has suffered because the Receiver agreed to these negotiated adjustments to the original Cash Purchase Price.

■ As for the holdbacks: the Receiver acknowledges that they are unusual (with one exception: the holdback for breach of representations and warranties). But he correctly points out that everything about Condor and the proposed sale is unusual as well. Having run his company in a manner that violated the law and attracted serious regulatory intervention, Baron has no cause to complain if the unusual circumstances he created led to the inclusion of unusual terms in the PPA.

The holdbacks themselves are not *per se* unreasonable. I cannot say that the Receiver failed to exercise business judgment by agreeing to hold back a sum in the event that Baron refuses to cease his litigious opposition to the sale of Condor's assets to any purchaser not of his choosing. Not only is the holdback little different from a "hold harmless" or indemnification clause, which is standard in many business contract, but it has the advantage of capping Condor's liability to O–Z. Nor can I say that it violated the Receiver's business judgment to hold back a small amount to cover unanticipated remediation costs that may further impair the value of the portfolio to the purchaser. In any event, these are holdbacks, not reductions in the purchase price; in the end (depending in large measure on how Baron be-

haves), the entire $5.8 million may be released to Condor.

In short, while these provisions may be out of the ordinary, it would do violence to the business judgment rule to insist that the Receiver pretend that he is dealing with ordinary business assets that are owned by a commercially reasonable individual and being sold in the ordinary course. I see no basis on which to disapprove the deal based on either the purchase price adjustments or the holdbacks.

■ But Baron's real objection to the deal is neither to the purchase price adjustments nor to the holdbacks. It is to the lengthy period between the Cut Off Date and the Closing Date. There is absolutely no question that this period (seven months and counting) is extraordinary; no one testified otherwise. And there is no question that it is costing Condor a lot of money. It is true that Condor would not have kept net collections for August, September, October, November and December if this deal had closed in July, as planned; but Condor would be keeping more of the upfront Cash Purchase Price if the Cut Off Date were closer in time to the Closing Date.

Baron believes that the Receiver should have renegotiated the Cut Off Date beyond May 31, 2015, and urges the Court to hold that the Receiver violated the business judgment rule by not doing so.

I credit the Receiver's testimony that he would have lost this deal if he tried to renegotiate the Cut Off Date. The economics of the transaction are such that a further delay in the "as of" date of the purchase would have reduced the value of the deal below the low end of the purchaser's investment guidelines, which would have doomed it with O–Z's investment committee. Of course, the Receiver did not ask the question, so he technically does not

know if his request would have been refused. But it is not always the case that there is no harm in asking; sometimes simply putting the question is all it takes to blow up an unstable deal with a jumpy counterparty. The Receiver's decision not to antagonize his buyer by trying to recut the deal was itself an exercise of business judgment, one informed by his dealings with O–Z (which, as he testified, were contentious and colored by the buyer's concern about Baron's interference) and by his knowledge of O–Z's investment guidelines (the deal was already close to what I understand to be the low end of the guidelines simply by virtue of the purchase price reductions occasioned by the state of the portfolio).

I also agree—because everything in the entire record of this case supports it—that most of the delay that has caused this interregnum to go on and on is attributable to Baron. I noted above that no reasonable purchaser would have closed this deal until there was no prospect of a stay pending an appeal from this Court's decision denying the motion for a preliminary injunction. Since that did not happen until late in August 2015, mid-September probably was the earliest feasible closing date. I can see no reason why the Receiver should be held to have breached his fiduciary duty for failing to (try to) renegotiate the Cut Off Date during this period; it was Baron, not the Receiver, who imperiled Condor's best interests by pursuing meritless litigation. Because Baron is the sole owner of Condor and will ultimately get the benefit from the sale, it is fair to say that he shot himself in the foot.

Similarly, it is clear that the due diligence remediation process was both necessitated and unduly prolonged by Baron's past mismanagement of Condor. The regulatory problems that were uncovered during O–Z's due diligence required the Receiver to remediate some 250,000 transactions in 10,000 separate accounts; and there were more than 1,000 loans in bankruptcy that were not correctly reflected on Condor's books. In order to try to hold the transaction together long enough to correct these problems, the Receiver agreed to extend the Exclusivity Date until the end of the day on October 16. Given his investment of time and money into this deal, I cannot conclude that these extensions breached his fiduciary duty to Condor; the remediation of what had already been uncovered would have been necessary in order to close with any buyer, not just O–Z. And during the Exclusivity Period, the Receiver was contractually prohibited from soliciting new bids, or even testing the market to see whether a better deal might be out there. (See Ex. 5 at Sec. 8.) It is not a breach of fiduciary duty to comply with the terms of a contract.

But the fact that most (though not quite all) of the delay can be attributed to Baron does not automatically mean that the Receiver is doing the best thing for Condor by going forward with this admittedly unusual deal. Once the Exclusivity Date passed, the period between the Cut Off Date and the Closing was approaching five months. If the Receiver's refusal to walk away from the deal at that point were designed to punish Baron for his intransigence, his decision would not be an exercise of sound business judgment; it would be action taken in bad faith.

But although the Receiver expressed great and understandable pique at Baron's obstreperous behavior, I reject as entirely unsupported by the evidence any suggestion of so base a motive on his part. Instead, I credit the Receiver's testimony that when he balanced the possible benefit from starting over against the downside of doing so, he determined that it was in

Condor's best interest to get this particular deal concluded.

The possible benefit was, of course, that Condor would get to keep those millions of dollars in net collections from June through today. That represents a real financial benefit to Condor (and ultimately to Baron, the corporation's sole shareholder). The downside, however, was equally real. Because the loan portfolio was essentially a wasting asset (it was "a melting ice cube," as the parties like to put it), the purchase price that can be negotiated in December 2015 is likely to be substantially lower than the purchase price that was negotiated six months earlier, and there is no guarantee that the money from collections released to Condor will cover the difference. The Receiver had already sunk considerable time, money and corporate energy into the O–Z transaction, if he started anew, there would be new bid fees, new due diligence (which only costs Condor money but disrupts its operations), new legal fees, and, of course, increased Receivership fees (something about which Baron protests vociferously on a monthly basis). Finally, in O–Z the Receiver had a buyer who was approved, and whose transaction was endorsed, by DFS, which has the right to veto any deal, not just one (like Baron). The buyer-vetting process would have to be repeated, with no guarantee of success.

Is there a chance that Condor would have come out better if the Receiver had starting shopping the deal on October 17, thereby giving O–Z an excuse to walk—or if he had simply walked himself? Of course there is. Is there any guarantee that Condor would have done as well or better by starting over? Certainly not. In those circumstances, and in the absence of any evidence of bath faith on the Receiver's part, his exercise of business judgment is entitled to deference.

## II. The Court Enjoins Baron from Further Interference with Consummation of the Sale

█ The Receiver also moves for an order enjoining Baron from asserting claims against the Receiver and the buyer of the loan portfolio related to the sale. This request, too, is granted.

█ In *S.E.C. v. Byers*, 609 F.3d 87, 89 (2d Cir.2010), the Second Circuit held that "district courts possess the authority and discretion to enter anti-litigation orders" based on the court's "broad equitable powers" in the context of a receivership. This authority is broad. In *Byers*, the Second Circuit held in the context of an SEC-appointed receivership that the district court was not to be constrained even by parties' "absolute right," under Section 303 of the Bankruptcy Code, to commence an involuntary bankruptcy against the debtor. The Second Circuit, quoting the Sixth Circuit, explained "The receivership court has a valid interest in both the value of the claims themselves and the costs of defending any suit as a drain on receivership assets. To this extent, the receivership court may issue a blanket injunction, staying litigation against the named receiver and the entities under his control unless leave of that court is first obtained." *Id.* at 91 (quoting *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543 (6th Cir.2006)). Accordingly, "An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership. While such injunctions are to be used sparingly, there are situations in which they are entirely appropriate." *Id.* at 93.

This Court created the receivership. As a result, it has an interest in Condor's property and in assuring that Baron does not diminish the property through frivolous litigation. Permitting further litigation would merely waste the receivership

assets and potentially scuttle a deal that the Receiver believes to be the best available. It appears to be settled law in this Circuit that I have the power to enjoin litigation against the Receiver, and I choose to exercise it here.

Baron's consent to the Final Consent Judgment actually makes the case much easier. The Second Circuit held, in *United States v. Royal Business Funds Corp.*, 724 F.2d 12 (2d Cir.1983), that a stipulation between a company and the Small Business Administration ("SBA") to place the company's assets in a receivership barred the company from commencing a bankruptcy petition, despite the right to otherwise do so under the Bankruptcy Act, particularly when the "receiver had substantially completed liquidation." *Id.* at 16. The company was licensed by the SBA to provide capital to small businesses. After failing to meet outstanding loan obligations to the SBA, the company agreed, pursuant to a stipulation and order, to place its assets under a receivership, to grant the receiver exclusive power to collect and administer the assets, and to accept limitations on the right of its board of directors to appoint and replace counsel. In return, the company received additional loans from the SBA. After accepting $3.5 million in new loans, a dispute with the receiver over management of the company's assets led the company's board of directors to file for bankruptcy. On appeal, the Second Circuit affirmed the district court's order barring the company from reneging on its obligations under the stipulation and order, noting that had the company wanted to file for bankruptcy, it could have freely done so before consenting to the receivership. According to the court, the bankruptcy would "disrupt the receiver's attempts to improve the company's fortunes." While the company was

"free at any time to seek the approval of the district court for the filing of such a petition as being in the best interests of the company," the court concluded that "In these circumstances, no public or private interest is served by allowing [the company] to repudiate the arrangements it made with the SBA." *Id.* at 16.

The same logic applies here. The Final Consent Judgment, signed by Baron both individually and on behalf of Condor, does not permit Baron to interfere with a sale, once a letter of intent has been signed. The Final Consent Judgment provides that "Stephen Baron shall have one opportunity to reject, and may reject, a Letter of Intent." But Baron already exercised that right—his "peremptory challenge," as his lawyer put it—last spring (to his economic sorrow). Now the terms of the Judgment specifically compel Baron to "cooperate with the Receiver" and provide that he "shall not interfere with the Receiver's negotiations for the sale or the effectuation of the sale of Condor's loans, including but not limited to providing all documentation and information requested by the Receiver, and complying with the Receiver's instructions concerning the sale of Condor's loan portfolio." (Ex. 4 at 9.) As in *Royal Business Funds*, no public or private interest is served by allowing Baron to repudiate the arrangement it reached with DFS limiting itself to a single veto.

It is arguable (and DFS has belatedly so argued, at least in the Second Circuit) that Baron, having exercised his one and only veto, has no standing to object to any deal the Receiver negotiates, and has to sign whatever documents (including litigation releases) are required by the terms of that deal. To this Baron argues that while he cannot reject any more deals for any reason or no reason,[8] he is free to seek to

8. Actually, Baron's Challenge was not free to

exercise his "peremptory" for any reason or

challenge a deal on its merits—a "challenge for cause," so to speak—if he reasonably believes that the Receiver is not acting in accordance with sound business judgment or is dissipating the assets of Condor (of which he is the 100% shareholder).

There is no need to decide whether it or Baron is correct, because this Court has entertained Baron's "cause" challenge to the O–Z deal and found it wanting. The deal has now been approved as a valid exercise of the Receiver's business judgment. The Court has concluded that the Receiver is entitled to business judgment deference. That means that Baron is required, under the very clear terms of the Final Consent Judgment to which he voluntarily agreed, to execute whatever documents are required for consummation of the O–Z deal and to cease his efforts, in court and otherwise, to derail the proposed sale. Otherwise the Final Consent Judgment is meaningless.

As Baron has already demonstrated a predilection for being uncooperative and contrary, this Court has ample authority to enforce its own Judgment by issuing an injunction that prevents Baron from (1) commencing any further action in this or any court to enjoin the consummation of or otherwise interfere with or frustrate the O–Z deal; (2) interfering with the management of the loan portfolio after the deal closes; and (3) compelling him to sign any and all documents that the Receiver needs

in order to close the deal. I intend to enter such an order.

Of course, this injunction will not bar Baron from taking an appeal from this order. But unless the Court of Appeals enters a stay pending appeal, Baron will be looking at a civil contempt if he violated the court's injunction and tried to stop the sale.

## III. Additional Matters

First, the Court will not enter any stay pending appeal. Baron does not, in this Court's opinion, have a viable appeal, and it is not in the best interest of Condor to further delay the consummation of the sale of the underperforming loans to O–Z. If Baron wants to continue his efforts to derail the deal, he will have to commence convince the Second Circuit that his appeal may have merit.

Second, the Court has received a letter from Harris Beach, former counsel to Baron, demanding that the Receiver pay the legal fees they incurred last summer—I presume in pursuit of the unsuccessful preliminary injunction motion and stay pending appeal. The Receiver has indicated that he does not believe, in an exercise of his business judgment, that it is in Condor's interest to pay Baron for trying to stop this deal.[9] I assume that the same argument would apply to the fees of Baron's new counsel, Neihaus LLP.

As far as this Court is concerned, this matter is remitted to the discretion of the

---

no reason; even in connection with his single veto, the Judgment required that he act reasonably ("Notwithstanding the foregoing [i.e., the veto right], Stephen Baron shall not unreasonably withhold his consent to any such potential sale." (Ex. 4 at 9.)) As this Court reads its own Judgment, the Receiver could have brought suit to compel Baron to accept the deal he vetoed if he thought the veto was exercised unreasonably. I do not fault the Receiver's business decision to forego fighting

that court battle and to focus instead on finding a buyer for Condor's underperforming loan portfolio; that seems to me a very sound business decision.

9. The Receiver has paid Harris Beach's bills in the past, but notes that he was working until then to try and get deals done. He has had enough obstructive behavior.

Receiver. I understand his position perfectly; certainly Harris Beach offers no compelling reason for me to countermand his decision.

## CONCLUSION

The Receiver's motion is granted in full. The parties have already been advised via short form order to send the Court proposed forms of order.

The Clerk of Court shall remove the motion at Docket # 235 from the Court's list of open motions.